# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE MEADWESTVACO STOCKHOLDERS LITIGATION | ) ) ) ) | Consolidated C.A. No. 10617-CB |

## MEMORANDUM OPINION

Date Submitted:  May 15, 2017
Date Decided:  August 17, 2017

Peter B. Andrews, Craig J. Springer, and David M. Sborz of ANDREWS & SPRINGER LLC, Wilmington, Delaware; Gregory M. Nespole, Mark C. Rifkin, Anita B. Kartalopoulos, and Kevin G. Cooper of WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP, New York, New York; *Lead Attorneys for Plaintiff.*

Gregory P. Williams and Sarah A. Clark of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Rachelle Silverberg and A.J. Martinez of WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; *Attorneys for Defendants MeadWestvaco Corporation, John A. Luke, Jr., Michael E. Campbell, James G. Kaiser, Richard B. Kelson, Susan J. Kropf, Gracia C. Martore, James E. Nevels, Timothy H. Powers, and Alan D. Wilson.*

William M. Lafferty and Ryan D. Stottmann of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Gary A. Bornstein of CRAVATH, SWAINE & MOORE LLP, New York, New York; *Attorneys for Defendant Rock-Tenn Company.*

**BOUCHARD, C.**

In this action, stockholders of MeadWestvaco Corporation seek damages relating to a strategic stock-for-stock merger of equals between MeadWestvaco and Rock-Tenn Company that closed in July 2015. The transaction was the product of on-again, off-again negotiations that occurred over a period of about nine months, and yielded a 9.1% premium for MeadWestvaco's stockholders. Eight of the nine MeadWestvaco directors who approved the merger were outside directors whose independence and disinterestedness are unquestioned. Five months elapsed between the signing of the merger agreement and the stockholder vote, but no other suitor emerged with a superior proposal even though the deal protections in the merger agreement concededly were reasonable. The merger received favorable recommendations from two leading proxy advisory firms, and was approved overwhelmingly by 98% of the MeadWestvaco stockholders who voted—after plaintiffs took some discovery and waived their disclosure claims.

The complaint asserts a claim for breach of fiduciary duty against the members of the MeadWestvaco board, and a second claim for aiding and abetting against Rock-Tenn. The thesis of the complaint is that the directors entered into the merger in bad faith in reaction to a threatened proxy contest by an activist investor. According to plaintiffs, the directors "flew blind" and left behind $3 billion of value in a transaction that impliedly valued MeadWestvaco at $9 billion. Defendants have moved to dismiss both claims for failure to state a claim for relief.

1

The core issue before the Court is whether the complaint contains factual allegations sufficient to state a reasonably conceivable claim against MeadWestvaco's directors for bad faith in connection with their approval of the merger. For the reasons explained below, I conclude that the complaint does not and thus must be dismissed.

## I.    BACKGROUND

Unless otherwise noted, the facts recited in this opinion come from the allegations in the Amended Verified Consolidated Class Action Complaint filed on June 21, 2016 (the "Complaint"), documents incorporated therein,[1] and additional documents the parties agreed could be considered on a motion to dismiss.[2] Any additional facts are either undisputed or subject to judicial notice.

### A.    The Parties

Before the merger, defendant MeadWestvaco Corporation ("MeadWestvaco" or the "Company") was a publicly-traded Delaware corporation headquartered in

---

[1] *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) (citations omitted) ("a plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss).

[2] Specifically, as a condition to defendants producing to plaintiffs certain "Starboard-related documents" after the transaction closed, the parties agreed defendants could use those documents in connection with motion to dismiss briefing "to the extent that plaintiffs use any of the newly-produced Starboard documents in an amended complaint or in connection with any motion to dismiss briefing." Transmittal Affidavit of Sarah A. Clark, Esq. ("Clark Aff.") Ex. 2 (Dkt. # 45).

Richmond, Virginia. MeadWestvaco was a global packaging company that also produced specialty chemicals for automotive, energy, and infrastructure businesses in a separate operating segment. Defendant Rock-Tenn Company ("RockTenn") was a Georgia corporation with headquarters in Norcross, Georgia. RockTenn was a packaging company that also manufactured containerboard and paperboard.

The Complaint names as defendants the nine members of the MeadWestvaco board of directors during the period leading up to and including its approval of the merger: Michael E. Campbell, James G. Kaiser, Richard B. Kelson, Susan J. Kropf, John A. Luke, Jr., Gracia C. Martore, James E. Nevels, Timothy H. Powers, and Alan D. Wilson. Luke was Chief Executive Officer and Chairman of the Board. The other eight members of the board were outside directors whose independence is not challenged.

Plaintiffs CWA Local 1180 Administrative Fund and CWA Local 1180 Members Annuity Fund allege they held shares of MeadWestvaco at all relevant times.

**B.    MeadWestvaco Begins to Consider a Transaction with RockTenn**

In March 2014, Vertical Research Partners published an analyst note proposing a merger between RockTenn and MeadWestvaco. The note stated that RockTenn, which faced a billion-dollar pension deficit, could benefit from MeadWestvaco's pension surplus, which exceeded $1 billion. That same month,

Starboard Value LP, a well-known activist investment firm, began purchasing MeadWestvaco stock.

In April 2014, MeadWestvaco's Chairman and CEO, John Luke, Jr., engaged in preliminary discussions with RockTenn's CEO, Stephen Voorhees, regarding a potential merger. On April 28, Luke presented the idea of a merger to the rest of MeadWestvaco's board, which asked a number of questions, including:

- who were the alternative candidates to RockTenn?

- why would MeadWestvaco bring RockTenn's valuation up as opposed to RockTenn dragging MeadWestvaco's valuation down?

- what RockTenn assets did MeadWestvaco want and which would MeadWestvaco want to dispose of?

- why was MeadWestvaco unable to create the same added value from divesting its Specialty Chemicals Segment and its remaining land development interests by acting alone?[3]

The next day, Luke told a fellow director that "[t]he questions were right on target, and we have or will have all answers shortly."[4]

### C.    Starboard Acquires a 5.6% Stake and Sends a Letter to the Board

On June 2, 2014, the MeadWestvaco board received a letter from Starboard stating that it had acquired approximately 5.6% of MeadWestvaco's outstanding common stock, making it one of the Company's largest stockholders. Starboard

---

[3] Compl. ¶ 35.

[4] Clark Aff. Ex. 6 MWV359.

asserted in the letter that the Company was not operating at its full potential and demanded an overhaul of the Company through cost cutting and the sale of its specialty chemicals business. Starboard also suggested a stock repurchase or an outright sale or merger of the Company. The letter was publicly filed on the day it was sent, putting the market on notice of Starboard's agenda.[5]

Later on June 2, after receiving Starboard's letter, the MeadWestvaco board convened a telephonic meeting with management. During the meeting, senior management reviewed and discussed with the board relative valuation, potential deal terms, negotiating strategy, and the culture and governance of a combined entity.[6] At the end of the meeting, the board directed Luke to explore a potential merger with RockTenn and to engage in negotiations with Voorhees.[7]

### D. Merger Negotiations Proceed Over the Next Six Months but are Terminated Twice by MeadWestvaco

In the two months following the June 2 meeting, Luke and Voorhees met in person at least five times to discuss the terms of a potential transaction.[8] On August 20, members of senior management for MeadWestvaco and RockTenn met face-to-face to conduct merger discussions along with the companies' respective financial

---

[5] Clark Aff. Ex. 10.

[6] Compl. ¶¶ 39-40; Clark Aff. Ex. 12.

[7] Compl. ¶ 39.

[8] Compl. ¶ 41.

5

advisors.[9]  Bank of America Merrill Lynch and Goldman, Sachs & Co. participated as MeadWestvaco's financial advisors.  MeadWestvaco terminated the negotiations and the meeting ended without an agreement because MeadWestvaco refused to accept an exchange ratio below the then-market price of its stock.

On September 29, 2014, Voorhees called Luke to re-engage in merger negotiations.  Given the gap that existed between the parties in August, MeadWestvaco would agree to engage in merger discussions only if MeadWestvaco were valued at least at its market price.[10]  Because RockTenn's overture was sufficiently constructive to meet this minimum condition, the parties re-engaged in merger discussions.

Negotiations with RockTenn continued throughout October 2014, but stalled again in November.  On November 16, Luke informed the MeadWestvaco board that RockTenn was unwilling to proceed on terms acceptable to MeadWestvaco.  This was the second time over the past several months that MeadWestvaco terminated merger negotiations with RockTenn.

---

[9] Compl. ¶ 46.

[10] Compl. ¶ 47.

**E.  MeadWestvaco Decides to Spin-Off its Specialty Chemicals Business as Starboard Signals a Potential Proxy Fight**

On October 2, 2014, in the midst of its on-again, off-again merger discussions with RockTenn, the MeadWestvaco board considered a potential spin-off of its specialty chemicals business.

On November 10, 2014, shortly before MeadWestvaco broke off negotiations with RockTenn for a second time, its board met with Starboard, which made a presentation about enhancing the Company's value.  One of Starboard's suggestions was to spin-off the Company's specialty chemicals business.  During the same meeting, the board and its outside legal and financial advisors discussed the possibility of a spin-off, allegedly as part of a response to the threat that Starboard would run a proxy contest against the MeadWestvaco board,[11] and reviewed again the rationale for a combination with RockTenn and the value to stockholders it could create.[12]

In December 2014, Starboard increased its ownership stake in MeadWestvaco to 6.1%.  Also in December, signaling a potential proxy fight, Starboard announced it had entered into advisory agreements with the previous Chief Operating Officer

---

[11] Compl. ¶ 48.

[12] Clark Aff. Ex. 11 at MWV248-49.

of Smurfit-Stone Container Corp. before it was acquired by RockTenn in 2012, and the Chairman of Soundview Paper Company.

On January 8, 2015, MeadWestvaco issued a press release announcing that the board had approved a plan to spin off the specialty chemicals division into a separate, publicly-traded company. The Company also announced that it was selling off its Europe-based tobacco folding carton business for an undisclosed amount. On the day of the January 8 press release, the Company's stock price rose approximately 5.8% higher on the news to close at $45.59 per share, but fell the next day to close at $44.50.

**F.     RockTenn Seeks to Resume Merger Discussions, and the Parties Reach an Agreement in Principle on an Exchange Ratio**

On January 9, 2015, Luke and Voorhees met for the first time since discussions fell apart in November to resume discussions about a potential merger. During the meeting, Voorhees proposed an "at market" stock-for-stock merger based on the ratio of the market value of MeadWestvaco stock to RockTenn stock at the time, meaning that each share of MeadWestvaco stock would be converted into 0.71 shares of the combined entity.[13]  Voorhees also proposed that the combined entity

---

[13] During briefing and initially at oral argument, plaintiffs inexplicably disputed that a transaction involving a 0.71 exchange ratio was ever discussed and contended that the "one and only" proposal RockTenn made involved a 0.78 exchange offer. The depositions plaintiffs took plainly show otherwise. *See* Rakowski Dep. at 172 (Dkt. #51) (testifying that RockTenn "came in at .71 at market"); Clark Supp. Aff. Ex. 34 (Luke Dep.) at 141-3 (Dkt. # 55) (testifying that Voorhees proposed an exchange ratio of ".71 to 1" based on the

would have a twelve-person board, with RockTenn appointing seven directors and MeadWestvaco appointing five directors; that Voorhees would remain as CEO; and that Luke would become Chairman of the combined company.[14]

On January 13, Luke sent an email to Michael Campbell, MeadWestvaco's lead director, stating: "We have also had outreach from [RockTenn]. We are working with our advisors to assess the seriousness of their intent. If there is substance worth discussing, I will let you know."[15]

The next day, on January 14, after Luke informed Voorhees that an at-market transaction would not be acceptable to MeadWestvaco, Luke and Voorhees agreed to proceed on the basis of a 0.78 exchange ratio.[16] Two days later, on January 16, Luke and Voorhees further agreed to amend the prior proposal to increase the size of the board for the combined company to fourteen directors, with RockTenn appointing eight directors and MeadWestvaco appointing six directors.

On January 19, the MeadWestvaco board met to discuss the proposed merger terms with their financial and legal advisors. In addition to Bank of America Merrill

---

ratio of the value of MeadWestvaco stock to Rock-Tenn stock in the market at the time). When confronted with this evidence at oral argument, plaintiffs' counsel apologetically conceded the point. Tr. Oral Arg. at 94-5 (Dkt. #63).

[14] Compl. ¶ 65.

[15] Compl. ¶ 66; Clark Aff. Ex. 27 MWV1180.

[16] Compl. ¶ 69.

9

Lynch and Goldman Sachs, Greenhill & Co., LLC had been added as a third financial advisor. Wachtell, Lipton, Rosen & Katz provided outside legal counsel.

On January 23, in the midst of its deliberations over the proposed merger, the board agreed to extend the deadline for Starboard to nominate a dissident slate to February 27, 2015.

On January 25, the MeadWestvaco board met and unanimously approved an Agreement and Plan of Merger (the "Merger Agreement") under which MeadWestvaco stockholders would receive 0.78 shares of stock in the combined entity for each MeadWestvaco share. The "indicated price" derived from this exchange ratio was $49.13 per share, representing a 9.1% premium over the Company's stock price on the last trading day before the transaction was announced.[17] According to the definitive proxy statement (the "Proxy"), MeadWestvaco's stockholders would receive approximately 50.1% of the shares of the combined entity and RockTenn's stockholders would receive the balance. Both parties estimate that the transaction implied a value for the Company of approximately $9 billion.[18] All three of MeadWestvaco's financial advisors opined that the transaction was fair to the Company's stockholders.[19]

---

[17] Compl. ¶ 74.

[18] *See* Tr. Oral Arg. at 7, 52.

[19] Proxy at 56.

The Merger Agreement contained a non-solicitation clause, matching and information rights, a fiduciary-out in case of a superior offer, and a $230 million termination fee[20] equating to less than 3% of the value attributed to the Company in the transaction. The Merger Agreement also provided that the spin-off of the specialty chemicals division would occur after the merger closed.[21]

On May 20, 2015, the Proxy was issued in advance of a MeadWestvaco stockholder meeting scheduled for June 24 to consider the proposed merger. In June 2015, ISS Proxy Advisory Services and Glass Lewis & Co., LLC both issued advisory reports recommending that stockholders vote in favor of the proposed merger.[22] On June 24, 2015, MeadWestvaco's stockholders approved the merger, with 83% of the outstanding shares voting, of which 98% were voted in favor of the transaction.[23] The transaction closed on July 1, 2015.

## II.    PROCEDURAL POSTURE

After the transaction was announced, three class action lawsuits were filed, which were consolidated on March 9, 2015. On June 3, 2015, the parties stipulated to entry of an order providing for certain discovery in advance of a preliminary injunction hearing, which was scheduled for June 16. Within a matter of days,

---

[20] Compl. ¶¶ 78-81.

[21] Compl. ¶ 75.

[22] Clark Supp. Aff. Ex. 32 at 2; Clark Supp. Aff. Ex. 33 at 6.

[23] Clark Aff. Ex. 20.

plaintiffs abandoned their preliminary injunction motion and agreed to "waive any disclosure claims based on any information available to them" as of that date in exchange for certain additional discovery from defendants, in particular their agreement to make three witnesses available for depositions after the closing.[24]

In the first half of 2016, plaintiffs deposed MeadWestvaco's CEO and CFO at the time of the merger (John Luke and Mark Rajkowksi) and a representative of one of its financial advisors (Colin Covey of Goldman Sachs). On July 21, 2016, plaintiffs filed the operative Complaint, which contains two claims. Count I asserts a claim for breach of fiduciary duty against the nine members of the MeadWestvaco board who approved the merger. Count II asserts a claim for aiding and abetting against RockTenn.

On September 6, 2016, defendants moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

## III. ANALYSIS

The standards governing a motion to dismiss for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate

---

[24] *See* Clark Aff. Ex. 21 ¶ 6.

unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[25]

Although this standard is minimal, the Court "will not credit conclusory allegations or draw unreasonable inferences in favor of the Plaintiffs,"[26] nor will it "accept every strained interpretation of the allegations proposed by the plaintiff."[27]

## A.     The Parties' Contentions

Given that the merger was a strategic combination of two publicly-traded, widely-held companies without any controllers, and that the consideration MeadWestvaco stockholders received consisted entirely of stock of the combined entity, the merger is not subject to entire fairness review *ab initio*[28] or enhanced scrutiny under *Revlon*.[29]  Plaintiffs do not contend otherwise.  As a result, the

---

[25] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal citations omitted).

[26] *In re BJ's Wholesale Club, Inc. S'holders Litig.*, 2013 WL 396202, at *5 (Del. Ch. 2013).

[27] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (internal quotations omitted).

[28] *See Orman v. Cullman*, 794 A.2d 5, 20 n.36 (Del. Ch. 2002) ("Usually, the entire fairness standard only applies at the outset ('*ab initio*') in certain special circumstances, viz, a squeeze out merger or a merger between two companies under the control of a controlling shareholder.").

[29] *See, e.g.*, *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 71 (Del. 1995) (internal quotations omitted) (noting that a corporation does not undergo a change of control where control of the postmerger entity remains in "a large, fluid, changeable and changing market"); *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1290 (Del. 1994) (same); *Paramount Commc'ns, Inc. v. Time Inc.*, 571 A.2d 1140, 1150 (Del. 1989) (same).

MeadWestvaco board's decision to approve the merger presumptively is governed by the business judgment rule.[30]

Furthermore, given that MeadWestvaco's certificate of incorporation contains a Section 102(b)(7) provision exculpating its directors from personal liability for any breach of the fiduciary duty of care,[31] plaintiffs' claim for post-closing damages against the directors for breach of fiduciary duty can survive only if the Complaint alleges facts from which it reasonably can be inferred "that (1) a majority of the Board was not both disinterested and independent or (2) that the [Board] did not act in good faith."[32]

Although plaintiffs contend that Starboard's presence was the "impetus" for the board's decision to engage in negotiations with RockTenn that led to the merger, they "do not argue that Starboard created a disabling conflict [or] that the looming proxy fight with Starboard prevented the Board from appropriately conducting their duties."[33] The Complaint, moreover, is otherwise devoid of any allegations calling

---

[30] *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1993) (internal quotations omitted) (business judgment rule is a "presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company").

[31] Clark Aff. Ex. 26 Art VIII.

[32] *BJ's Wholesale Club*, 2013 WL 396202, at *6.

[33] Pl.s' Br. at 40 (Dkt. #50). Plaintiffs' position is not surprising. "Delaware law routinely rejects the notion that a director's interest in maintaining his office, by itself, is a debilitating factor." *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 175 (Del. Ch. 2005); *see also In re TriQuint Semiconductor, Inc. Stockholders Litig.*, 2014 WL 2700964, at *3 (Del. Ch. June 13, 2014) (rejecting as not colorable plaintiffs' assertion that

14

into question the disinterestedness or independence of any of the eight non-management directors on MeadWestvaco's nine-member board. Even as to Luke, MeadWestvaco's CEO, who did not obtain a management position in the combined entity, plaintiffs do not contend that he suffered from a disabling conflict of interest. The plaintiffs' case thus rests entirely on the board's alleged failure to discharge its duties in good faith.

Defendants make essentially two arguments in response—that the allegations of the Complaint do not plead a viable claim for bad faith and, even if they did, that the board's decision to approve the merger was cleansed under *Corwin v. KKR Fin. Holdings, LLC*[34] and its progeny by virtue of the stockholders' overwhelming approval of the merger. Because the first issue is dispositive for the reasons discussed below, I do not address the second issue.

### C. Count I Fails to State a Claim for Bad Faith

This Court has held on numerous occasions that "to state a bad-faith claim, a plaintiff must show either [1] an extreme set of facts to establish that disinterested

---

Tri-Quint's directors could not consider the merits of a merger impartially where Starboard had launched a proxy contest to replace six of the eight members of the board); *In re Lukens Inc. Shareholders Litig.*, 757 A.2d 720, 729 (Del. Ch. 1999) ("there is no logical force to the suggestion that otherwise independent, disinterested directors of a corporation would act disloyally or in bad faith and agree to a sale of their company 'on the cheap'" merely "because of the possibility that [some of the directors] might face opposition for reelection at the next annual stockholders meeting."), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000).

[34] 125 A.3d 304 (Del. 2015).

directors were intentionally disregarding their duties or [2] that the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[35]  This is a difficult standard to meet.  As our Supreme Court explained in *Lyondell Chem. Co. v. Ryan,* "Directors' decisions must be reasonable, not perfect.  In the transactional context, [an] extreme set of facts [is] required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties,"[36] and even one "plausible and legitimate explanation for the board's decision" would negate a reasonable inference that the decision was "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[37]

Here, plaintiffs focus on what they refer to as MeadWestvaco's "Four Non-Core Assets:"  its specialty chemicals business, its pension surplus, its Brazilian subsidiary (Rigesa), and certain real estate investments in South Carolina.  According to plaintiffs, the directors—who approved the merger at an implied

---

[35] *In re Chelsea Therapeutics International Ltd. Stockholders Litigation*, 2016 WL 3044721, at *7 (Del. Ch. May 20, 2016) (internal quotations omitted); *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *6 (Del. Ch. June 30, 2014) (dismissing a plaintiff's *Revlon* claim for failure to plead a non-exculpated breach of fiduciary duties); *BJ's Wholesale Club*, 2013 WL 396202, at *7 (same); *In re Alloy, Inc.*, 2011 WL 4863716, at *7 (Del. Ch. Oct. 13, 2011) (same).

[36] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) (alterations in original) (internal quotations omitted).

[37] *Alloy*, 2011 WL 4863716, at *12.

valuation for MeadWestvaco of approximately $9 billion—knew these assets were undervalued by the market and "deprived MeadWestvaco's shareholders of at least $3 billion of additional value"[38] by "flying blind" and doing "virtually nothing" to meet their fiduciary duties.[39]

In my opinion, the Complaint's allegations fall far short of pleading the "extreme set of facts" necessary to establish a reasonably conceivable bad-faith claim on the theory that the concededly overwhelming majority of disinterested and independent MeadWestvaco directors (8 of 9) intentionally disregarded their fiduciary duties with respect to the process that led to the merger.

Plaintiffs' own pleading suggests that, far from "flying blind," the board was actively engaged in the process. The board first considered merging with RockTenn in April 2014, about nine months before the transaction ultimately was approved.[40] After the April 28 board meeting where Luke first raised the possibility of a combination, the directors asked a series of probing questions regarding a potential transaction with RockTenn—hardly evidence of an *intentional disregard* of one's duties.[41] In total, the board held at least six meetings to consider a potential

---

[38] Compl. ¶ 3.

[39] Pl.s' Br. at 27, 40.

[40] Compl. ¶ 34.

[41] Compl. ¶¶ 34-35. The parties vigorously dispute whether the directors received satisfactory answers to these questions. Plaintiffs assert in conclusory fashion they did not. Referring to board presentations and other documents, defendants assert they did. Given

17

transaction[42] and received numerous valuations of the Company.[43]  The directors were aided by prominent legal counsel (Wachtell Lipton) and three nationally recognized financial advisors—Bank of America Merrill Lynch, Goldman Sachs, and Greenhill.

The negotiation history between the parties also negates the notion that the directors sanctioned a flawed process in deliberate disregard of their fiduciary obligations.  As alleged in the Complaint, it was MeadWestvaco that twice terminated negotiations with RockTenn, first in August 2014 when "MeadWestvaco refused an exchange ratio at anything below the current market price of its stock,"[44] and then a few months later in November when "Luke informed the Board that RockTenn was unwilling to proceed on terms acceptable to MeadWestvaco."[45] MeadWestvaco also did not accept RockTenn's "one and only offer," as plaintiffs

---

that the directors posed these questions in the first place, which indicates a genuine effort to fulfill rather than to ignore their fiduciary obligations, a failure to obtain satisfactory answers—a conclusory allegation for which plaintiffs offer no support—would seem, at most, to implicate their duty of care.  *See Lyondell*, 970 A.2d at 243 ("there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties").  As noted previously, the directors are exculpated from liability for any breach of their duty of care.

[42] Compl. ¶¶ 34, 39, 48, 51, 53-55, 73, 74.

[43] *See* Clark Aff. Exs. 11, 12, 28-31.

[44] Compl. ¶ 46.

[45] Compl. ¶ 50.

initially charged.[46]  To the contrary, as plaintiffs later conceded,[47] MeadWestvaco agreed to the merger only after rejecting RockTenn's proposal for an "at market" transaction, when RockTenn agreed to increase the exchange ratio from 0.71 to 0.78, yielding a 9.1% premium for MeadWestvaco's stockholders.  The Merger Agreement, furthermore, included a fiduciary-out and a concededly reasonable break-up fee of less than 3% to afford stockholders the opportunity to receive a superior proposal.[48]

Plaintiffs further criticize the term of the Merger Agreement that provided for the specialty chemicals division spin-off to occur after the merger closed.  Even if one assumes, *arguendo*, that the individual defendants failed "to take any specific steps during the sale process," that would not be enough to demonstrate "a conscious disregard of their duties," even "in the Revlon context, which is not the case here."[49] More to the point, changing the deal to time the spin-off of the specialty chemicals division to occur before the merger logically would have changed the relative valuations and therefore the exchange ratio obtained in the transaction.

---

[46] Pl.s' Br. at 27.

[47] *See supra.* n.13.

[48] Tr. Oral Arg. at 54.

[49] *In re Paramount Gold & Silver Corp. Stockholders Litig.*, 2017 WL 1372659, at *15 (Del. Ch. Apr. 13, 2017) (internal quotations omitted).

In sum, the facts pled in the Complaint do not support a reasonable inference that the eight concededly independent and disinterested directors on the board, who met numerous times with the aid of legal and financial advisors over a nine-month span, intentionally disregarded their fiduciary duties in connection with their oversight of what plaintiffs describe as "near a year of on-again off-again discussions."[50] As this Court recently held: "As long as a board attempts to meet its duties, no matter how incompetently, the directors did not consciously disregard their obligations."[51]

The allegations in the Complaint also do not support a reasonable inference that the ultimate decision to approve a strategic merger that impliedly valued the Company at approximately $9 billion was itself an act of bad faith. "Delaware law requires that for an allegation of price inadequacy to support a bad faith claim, the Court would need to conclude that the price was so far beyond the bounds of reasonable judgment that it seems inexplicable on any ground other than bad faith."[52] Our Supreme Court has equated showing that the substance of a board's decision is an act of bad faith to meeting the onerous burden of proving a waste claim: "To prevail on a waste claim or a bad faith claim, the plaintiff must overcome the general

---

[50] Pls.' Br. at 24.

[51] *Chen v. Howard-Anderson*, 87 A.3d 648, 683 (Del. Ch. 2014).

[52] *In re Crimson Expl. Inc. Stockholder Litig.*, 2014 WL 5449419, at *23 (Del. Ch. Oct. 24, 2014).

20

presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests."[53]

"Delaware corporate fiduciary law does not require directors to value or preserve piecemeal assets in a merger setting."[54] What is relevant is the value of the enterprise as a whole. Even under the deferential motion to dismiss standard, the merger consideration here is nowhere near so "egregious,"[55] so "irrational,"[56] or "so far beyond the bounds of reasonable judgment" as to be "inexplicable on any ground other than bad faith."[57]

First, the MeadWestvaco board negotiated an exchange ratio representing a 9.1% premium to its stockholders in a strategic merger between two widely-held companies where MeadWestvaco stockholders obtained 50.1% of the combined entity even though, according to information provided to the board, MeadWestvaco contributed less than 50% of the combined company's revenue, net income, and EBITDA.[58] The transaction at issue here did not involve a sale of control. It was a

[53] *White v. Panic*, 783 A.2d 543, 554 n.36 (Del. 2001).

[54] *Arkansas Teacher Ret. Sys. v. Caiafa*, 996 A.2d 321, 322 (Del. 2010).

[55] *Panic*, 783 A.2d at 554 n.36.

[56] *Panic*, 783 A.2d at 554 n.36.

[57] *Ramtron*, 2014 WL 2931180, at *6.

[58] Proxy at 102-3; Clark Supp. Aff. Ex. 28 MWV72-74. I take judicial notice of these financial metrics not for their truth, but to show that this information was provided to the board, a fact which is not reasonably subject to dispute. *See Santa Fe*, 669 A.2d at 70

strategic merger, ostensibly of equals.  Even if it were true that the premium was low, "[t]here is no rule that a low premium represents a bad deal, much less bad faith."[59]

Second, three separate, nationally recognized financial advisors, none of which are alleged to be conflicted, opined that the merger was fair to MeadWestvaco's stockholders.[60]  A "board's receipt of a fairness opinion typically supports a factual inference that the board acted properly when deciding to proceed with a transaction."[61]

---

("Despite the fact that a SEC filing may constitute hearsay with respect to the truth of the matters asserted therein, courts may consult these documents to ascertain facts appropriate for judicial notice under D.R.E. 201.").

[59] *Crimson*, 2014 WL 5449419, at *23 (rejecting bad-faith challenge to stock-for-stock merger where target stockholders who obtained approximately 20% of the combined entity received a premium of only 7.7% in the transaction); *see also, e.g., BJ's Wholesale Club*, 2013 WL 396202 (dismissing bad-faith claims in leveraged-buyout providing only a 6.6% premium).

[60] Proxy at 56.  The Complaint alleges that Greenhill's analysis was "flawed' because it overstated MeadWestvaco's liabilities by "over $1 billion in debt."  Compl. ¶ 91.  Even if this is true, two other financial advisors rendered fairness opinions that are not alleged to be flawed.

[61] *Alloy*, 2011 WL 4863716, at *10; *see also, e.g., McMillan v. Intercargo Corp.*, 768 A.2d 492, 505 n. 55 (Del. Ch.2000) ("The board's reliance upon an investment banker (whose independence and qualifications are not challenged in the complaint) is another factor weighing against the plaintiffs' ability to state an actionable claim."); *In re Dairy Mart Convenience Stores, Inc.*, 1999 WL 350473, at *13 (Del. Ch. May 24, 1999) ("[A]n outside financial advisor's opinion on the terms of a transaction generally gives the Court comfort with respect to the reasonableness of the board's action."); *Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *23 (Del. Ch. Jan. 25, 1999) (board decision to accept bidder's offer without market check reasonable in part because of fairness opinion); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1143 (Del. Ch. 1994) (fairness opinion of outside financial advisor among factors supporting a finding that transaction was entirely fair).

Third, the deal protections in the Merger Agreement, which included a fiduciary-out and a $230 million break-up fee, concededly were reasonable.[62] The $3 billion in value that plaintiffs assert was left on the table is approximately *thirteen times* the size of the break-up fee. Starboard's initial letter to the board stated that "[m]any of MeadWestvaco's U.S. competitors have large underfunded pension plans" and specifically identified a second company other than RockTenn as a potential merger partner with "pension liabilities that exceed $1 billion."[63] If the exchange ratio really was so irrational, "one might think some other buyer would emerge to capture this surplus."[64] Despite the fact that the transaction did not close for more than five months after the Merger Agreement was signed, none did.

Finally, two major independent proxy advisory firms—ISS and Glass Lewis—recommended that stockholders vote to approve the merger.[65] The

---

[62] Tr. Oral Arg. at 54. *See e.g.*, *Ramtron*, 2014 WL 2931180, at *8-9 (no-solicitation provisions have been "repeatedly" approved by the court, matching rights are "unremarkable and customary procedural restraints," and a 4.5% termination fee is "highly unlikely" to have been "unreasonably high").

[63] Clark Aff. Ex. 9 MWV1015.

[64] *Crimson*, 2014 WL 5449419, at *24.

[65] *See In re Zale Corp. Stockholders Litig.*, 2015 WL 5853693, at *16 (Del. Ch. Oct. 1, 2016) (internal citations omitted) ("First, to the extent that TIG's, GAMCO's, and Glass Lewis's oppositions to the Merger are evidence that the Merger Price was inadequate, Golden Gate's and ISS's support for the Merger are evidence of the Merger's fairness. Although I must draw all inferences in favor of Plaintiffs on Defendants' motion to dismiss, those inferences still must be reasonable. Because a large stockholder and an independent proxy advisory firm supported the Merger Price, I do not consider it reasonably

23

Company's stockholders did so overwhelmingly—to the tune of 98% of the votes cast at a meeting held after plaintiffs obtained preliminary discovery and elected to waive their disclosure claims. Notably, the Complaint nowhere suggests that Starboard expressed any opposition to the merger price or believed that the MeadWestvaco directors left any additional value behind.

At bottom, plaintiffs' theory that the concededly disinterested and independent directors on MeadWestvaco's board intentionally disregarded their fiduciary obligations to leave $3 billion of additional value on the negotiating table—equating to *one-third* of the $9 billion implied value of the Company in the merger, or about *one-quarter* of what plaintiffs apparently believe the Company should have been valued at for purposes of the merger ($12 billion)—is simply not credible. Based on the facts pled in the Complaint and that otherwise may be considered on the present motion, it is not reasonably conceivable that the directors' decision to agree to a strategic merger of equals yielding a 9% premium for MeadWestvaco's stockholders is essentially inexplicable on any ground other than bad faith.

---

conceivable that the opposition of the firms on which Plaintiffs rely would make that price 'essentially inexplicable on any ground other than bad faith.'").

## D.    Count II Fails to State a Claim for Aiding and Abetting

To adequately plead an aiding and abetting claim, plaintiffs must allege facts demonstrating "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."[66]  Because plaintiffs have failed to state a claim for breach of a fiduciary duty, their aiding and abetting claim fails for lack of a predicate breach.

Count II fails to state a claim for a second reason.  The "knowing participation" element of an aiding and abetting claim is a "stringent standard that turn[s] on proof of scienter."[67]  But the Complaint contains no non-conclusory facts suggesting that RockTenn knew that MeadWestvaco's directors, who oversaw a process in which MeadWestvaco terminated negotiations on at least two occasions and obtained a premium for its stockholders after rejecting an "at market" proposal, had failed to discharge their  fiduciary duties.[68]  To the contrary, the Complaint's

---

[66] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

[67] *Lee v. Pincus*, 2014 WL 6066108, at *13 (Del. Ch. Nov. 14, 2014).

[68] In a one-paragraph argument that fails to cite any allegation of the Complaint, plaintiffs list several facts that RockTenn allegedly "knew."  Pl.s' Br. at 49-50.  These assertions are all either conclusory—"RockTenn certainly knew that Luke failed to negotiate"—or have no bearing on whether RockTenn participated in a breach of fiduciary duty—"RockTenn knew that Starboard was ramping up its pressure on the Board."  *Id.*  In any event, "[a]rguments in briefs do not serve to amend the pleadings."  *California Public Employees' Ret. System v. Coulter*, 2002 WL 31888343, at *12 (Del. Ch. Dec. 18, 2002).

25

allegations paint a picture of genuine arm's-length bargaining that is the antithesis of an aiding and abetting claim. [69]

## IV. CONCLUSION

For the reasons stated above, both claims in the Complaint fail to state a claim for relief. Accordingly, defendants' motions to dismiss are GRANTED.

**IT IS SO ORDERED.**

---

[69] *Morgan v. Cash*, 2010 WL 2803746, at *1 (Del. Ch. July 16, 2010) (Strine, V.C.) (recognizing "the long-standing rule that arm's-length bargaining is privileged and does not, absent actual collusion and facilitation of fiduciary wrongdoing, constitute aiding and abetting").