# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CAMBRIA EQUITY PARTNERS L.P., CAMBRIA COINVESTMENT FUND L.P. and MARIO MAURI, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2019-0522-MTZ |
| RELIGHT ENTERPRISES S.A., SWIFT CURRENT ENERGY LP, and WIND HOLDCO 2 LLC, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  January 5, 2021
Date Decided:  January 5, 2021
Date Issued:  June 8, 2021

John G. Harris and Richard I. G. Jones, Jr., BERGER HARRIS LLP, Wilmington, Delaware; Lydia Ferrarese and Mark Weissman, HERZFELD & RUBIN, P.C., New York, New York, *Attorneys for Plaintiffs.*

Philip A. Rovner and Jonathan A. Choa, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; John J. Kuster and Deborah R. Sands, SIDLEY AUSTIN LLP, New York, New York, *Attorneys for Defendants Swift Current Energy LP and Wind Holdco 2 LLC.*

**ZURN, Vice Chancellor.**

This action concerns the sale of a closely held Delaware corporation, Relight U.S. Corporation ("Relight U.S.") by its majority stockholder, Relight Enterprises S.A. ("Relight") to defendants Swift Current Energy LP and Wind Holdco 2 LLC (collectively, "Swift"). The sale was accomplished through two interrelated steps. First, Relight bought out Relight U.S.'s minority stockholders, the plaintiffs here, (the "Cash-Out"), at a purchase price (the "Cash-Out Price") based on the value of the forthcoming Relight U.S. sale (the "Relight Price"). Second, Relight sold all Relight U.S. stock to Swift (the "Relight Purchase") at the Relight Price, which was set by a formula valuing the underlying operations' performance at certain intervals. The Relight Purchase closed in November 2016.

After closing, Relight and Swift twice amended the Relight Purchase agreement to lower the Relight Price, which in turn lowered the Cash-Out Price. The plaintiffs learned of the amendments in 2018 and concluded that they were victims of a scheme to excise Relight U.S.'s minority stockholders on the cheap. In particular, the plaintiffs theorize that Swift and Relight's principals must have colluded in a pre-close, nefarious back-door agreement to (1) inflate the Relight Price in order to entice the plaintiffs to sell in the Cash-Out, and (2) thereafter close the Relight Purchase at a lower price that consequently diminished the plaintiffs' Cash-Out value and increased transaction value for Swift and Relight.

1

But on Swift's motion for summary judgment, the record does not support the plaintiffs' theory; there is no evidence of such an agreement. Rather, the record demonstrates that the plaintiffs were included in the negotiation of the Relight Purchase agreement and did not bargain for any minimum Relight Price or Cash-Out Price. After the Relight Purchase agreement closed, Relight's principals renegotiated for quicker payments at a lower price; while this was to the plaintiffs' detriment, Swift is not liable for aiding and abetting and was not unjustly enriched. This opinion grants summary judgment in Swift's favor.

## I.    BACKGROUND[1]

Relight is owned and controlled by Hakan Baykam and Gokhan Baykam (together, the "Baykams").[2]  Until August 2013, Relight was the sole owner of Relight U.S., a closely held Delaware corporation.[3]  Relight, Relight U.S., and the Baykams finance and develop large-scale wind energy projects.  Plaintiffs Cambria Equity Partners L.P. ("CEP"), Cambria Co Investment Fund L.P. ("CCF"), and Mario Mauri (collectively, "Plaintiffs") became Relight U.S. minority stockholders, investing in 2013 and 2015.[4]  Mauri controls both CCF and CEP.  After Plaintiffs

---

[1] Citations in the form of "Kuster Decl. —" refer to the Declaration of John J. Kuster in Support of Swift Current Energy LP and Wind Holdco 2 LLC's Motion for Summary Judgment, available at Docket Item ("D.I.") 88.  Citations in the form of "Kutser Decl. Ex. —" refer to the exhibits attached to the Kuster Declaration, available at D.I. 88 through D.I. 89, as well as D.I. 104.  Citations in the form of "Birchby Decl. —" refer to the Declaration of Matt Birchby in Support of Swift Current Energy LP and Wind Holdco 2 LLC's Motion for Summary Judgment, available at D.I. 87.  Citations in the form of "Birchby Decl. Ex. —" refer to the exhibits attached to the Birchby Declaration, also available at D.I. 87.  Citations in the form of "Harris Decl. —" refer to the exhibits attached to the Declaration of John G. Harris in Support of Plaintiffs Cambria Equity Partners L.P., Cambria Co Investment Fund L.P. and Mario Mauri's Opposition to Swift Current Energy L.P. and Wind Holdco 2 LLC's Motion For Summary Judgment, available at D.I. 100.  Citations in the form of "Harris Decl. Ex. —" refer to the exhibits attached to the Harris Declaration, available at D.I. 97 through D.I. 99.  Citations in the form of "Last Name Dep. —" refer to deposition testimony in the record.  Citations in the form of "Hr'g Tr. —" refer to the transcript of the January 5, 2021 oral argument and rulings on the Motion, available at D.I. 110.  And citations in the form of "Compl. —" refer to the Verified Complaint for Equitable Relief, available at D.I. 1.  Facts drawn from the Complaint are undisputed by the parties.

[2] Compl. ¶ 2.  This opinion refers to Hakan and Gokhan individually by their first names in pursuit of clarity.  I intend no familiarity or disrespect.

[3] *Id.*

[4] *See* Kuster Decl. Ex. 9; Kuster Decl. Ex. 10.

purchased their minority stake, Relight held approximately 80% of Relight U.S.'s shares.[5]

Relight U.S. began developing a wind farm in Illinois called Project Meridien (the "Project"). Relight U.S.'s wholly owned subsidiary, Meridien, LLC ("Meridien"), held the Project's assets.[6] Relight U.S. also owned a separate windfarm project called "Remason" or "Mason," which was situated near the Project.[7]

The value of such projects is often measured in "nameplate capacity," which is the product of (i) the maximum number of potential megawatts ("MW") a wind turbine can generate as determined by its manufacturer and (ii) the number of those wind turbines installed on the proposed project's property footprint.[8] The estimated value also depends on a number of other factors, including the project's net capacity factor ("NCF").[9] The NCF is the ratio of the amount of wind that could be expected

---

[5] *See* Kuster Decl. Ex. 9; Kuster Decl. Ex. 10.

[6] *See* Birchby Decl. Ex. 2.

[7] *See* Lent Dep. 21–22.

[8] Birchby Decl. ¶ 9. For example, if a wind turbine can produce 4 MW of electricity and 25 turbines are installed, then the nameplate capacity of a wind farm would be 100 MW. Assuming that the farm's nameplate capacity is 100 MW and the parties agreed to pay $50,000 per MW generated at the project site, the estimated purchase price would be $5 million. *Id.*

[9] *Id.*

to be present during a year that would pass through the project.[10] NCF is calculated using wind studies.[11] Small differences in NCF matter, as NCF predicts the amount of wind available to generate revenue-producing electricity.[12] In addition to nameplate capacity and NCF, the valuation of a wind farm can also be affected by regulatory and operational risks.[13]

## A. Swift And Relight Negotiate The Sale Of Meridien, Then The Relight Purchase.

Swift was formed in the summer of 2016 as a renewable energy developer that focuses on wind and solar energy projects in North America.[14] Swift's founders had identified the Project as an investment opportunity in 2014.[15] In July 2016, Swift contacted Relight about purchasing the Project.[16] Swift and Relight retained counsel and began negotiating.[17] Swift typically purchased asset holding companies like Meridien, rather than the parent entity like Relight.[18] Accordingly, Relight's

---

[10] *Id.* Because the wind does not blow 100% of the year, but instead blows, for example, 40% of the year, then a wind farm's NCF would be 40%. *Id.*

[11] *Id.* ¶ 11.

[12] *Id.*

[13] *See id.* ¶ 10.

[14] *Id.* ¶ 3.

[15] *Id.* ¶¶ 3–5.

[16] *Id.* ¶ 5.

[17] *Id.* ¶¶ 6–9; Birchby Decl. Ex. 1; Birchby Dep. 43–50.

[18] Birchby Decl. ¶ 7.

ownership was not particularly relevant to the transaction as initially contemplated because Swift was only interested in purchasing Meridien and its assets.[19]

On September 12, 2016, Swift and Relight executed a letter of intent for the sale and purchase of Meridien (the "September LOI").[20]  The September LOI stated that the Project was "expected to have approximately 178.2-189.6 MW of nameplate capacity,"[21] and estimated a purchase price of $85,000 per MW for its total installed nameplate capacity.[22]  Thus, if the Project's capacity was determined to be 189 MW, then the purchase price would be $16.065 million.[23]  That purchase price would be paid over time upon achievement of certain milestones, as is typical in a wind farm acquisition.[24]  The purchase price was subject to further due diligence.[25]  After executing the September LOI, Swift apprised their lender that the Project was "one of the best last stage wind projects currently available in the country," and that it promised to be a fruitful and "low risk" acquisition, projecting returns of at least 11% and "significant attention from the capital markets."[26]

---

[19] *Id.* ¶ 7; Lent Dep. 51–54.

[20] Birchby Decl. ¶ 14; Birchby Decl. Ex. 2; Birchby Dep. 101.

[21] Birchby Decl. Ex. 2 at SHSL_00005928; Birchby Dep. 101.

[22] Birchby Decl. Ex. 2 at SHSL_00005929.

[23] *Id.*

[24] Birchby Decl. ¶¶ 13–14; Birchby Decl. Ex. 2 at SHSL_00005929–30.

[25] Birchby Decl. Ex. 2 at SHSL_00005930, -31.

[26] Harris Decl. Ex. 40 at SWIFT00134614.

But Swift's continued due diligence revealed various issues with the Project, including with respect to an overestimated NCF, land rights, and metrics that would ultimately decrease the expected purchase price.[27]  Swift requested a purchase price reduction based on the Project's NCF.[28]  The Baykams initially refused, but eventually agreed to adjust the purchase price to account for the lower NCF.[29]

On October 28, Swift and Relight memorialized the price reduction in a second letter of intent (the "October LOI").[30]  The October LOI contemplated a purchase price of $77,500 per MW.[31]  Thus, if the Project had 189 MW of nameplate capacity, the purchase price would be approximately $14.6 million.[32]  Under the October LOI, the purchase price was to be paid over four milestones: (1) $1.75 million at closing; (2) 50% of the remaining purchase price when the Project obtained sufficient financing and permitting to be able to commence construction, also known as the "Notice to Proceed" or "NTP Date"; (3) 25% when the Project's first turbine was constructed, also known as the "Turbine Date"; and

---

[27] Birchby Decl. ¶¶ 9–11; Birchby Dep. 77–81; Lent Dep. 37–39.

[28] Birchby Decl. ¶ 15.

[29] *Id.*; Birchby Dep. 77–81; Birchby Decl. Ex. 3; Birchby Decl. Ex. 4.

[30] Birchby Decl. Ex. 5.

[31] Birchby Decl. ¶ 15; Birchby Decl. Ex. 5 at SWIFT00009391.

[32] Birchby Decl. ¶ 15; Birchby Decl. Ex. 5 at SWIFT00009391.

(4) the remainder once the Project was commercially operational, also known as the "COD Date."[33]

But on October 5, shortly before executing the October LOI, the Baykams proposed that Swift purchase Relight U.S., rather than Meridien, for tax purposes.[34] Swift had never contemplated a transaction at the parent level.[35] But after executing the October LOI, Swift ultimately agreed to pursue purchasing Relight U.S. instead of Meridien as a standalone asset.[36]

On October 27, one day before executing the October LOI, Swift confirmed to their lender they had agreed to final terms with Relight; that they might acquire Relight U.S.; and that "[a]t this stage we have not found additional liabilities or tax problems in acquiring Relight US Corp," but would "in the days remaining to close[,] focus diligence on tax issues and any liabilities that may be embedded in the US Corp."[37] Swift also informed their lender that, based on the NCF issues revealed through due diligence, they had successfully negotiated a "modest price reduction," which factored into Swift's decision to purchase Relight U.S. rather than Meridien.[38]

---

[33] Birchby Decl. ¶ 15; Birchby Decl. Ex. 5 at SWIFT00009391–92; *see* Lent Dep. 147–49, 153.

[34] Birchby Decl. ¶ 16; Birchby Decl. Ex. 6; Lent Dep. 52–54.

[35] Birchby Decl. ¶ 16; Lent Dep. 52–53.

[36] Birchby Decl. ¶ 16.

[37] Harris Decl. Ex. 41 at SWIFT00149648.

[38] *Id.*

As planned, Swift initiated due diligence specific to Relight U.S.[39] On November 1, Swift sent Relight U.S. a due diligence questionnaire that inquired as to Relight U.S.'s ownership structure, among other things.[40] Relight U.S. did not reply immediately.[41]

On November 2, Swift sent its lender an investment memo that addressed the Relight U.S. purchase.[42] Swift assured its lender it had "undertake[n] an ongoing additional level of liability and tax diligence since early October," and that "[t]o underwrite these additional risks, [Swift] negotiated a 9% reduction in total price."[43] Swift reaffirmed their belief that the Project promised to reap a favorable return on capital and to attract potential acquirers in the future.[44]

On November 15, after repeated prodding from Swift, Relight U.S. responded to Swift's due diligence questionnaire.[45] Relight U.S. disclosed CCF and Mauri as stockholders for the first time.[46] Swift was surprised to learn that Relight U.S was not wholly owned by Relight, as Swift believed it was negotiating with a single

---

[39] Birchby Decl. ¶¶ 16, 17; Lent Dep. 52–53.

[40] Birchby Decl. ¶ 17; Birchby Decl. Ex. 7.

[41] Birchby Decl. ¶ 17.

[42] Harris Decl. Ex. 42.

[43] *Id.* at SWIFT00034434.

[44] *See id.*

[45] Birchby Decl. ¶ 17; Birchby Decl. Ex. 8.

[46] Birchby Decl. ¶ 18; Birchby Decl. Ex. 8 at SWIFT00001919; Birchby Dep. 127–32.

counterparty.[47] Two days after receiving the questionnaire, Swift informed its team "that there is a never-disclosed investor in Cambria and Relight does not own 100% of the shares of the US entity."[48]

But Relight U.S. did not disclose CEP's ownership in the November 15 questionnaire.[49] As detailed *infra*, Relight had bought out CEP before Relight U.S. responded to the questionnaire. Swift did not learn of CEP until after the parties finalized the Relight Purchase on November 23.[50]

## B. Relight Negotiates To Buy Out Plaintiffs, And Swift Negotiates Protective Measures.

Even though Swift was surprised to learn that Mauri and CCF held stock in Relight U.S., Relight had been negotiating with Plaintiffs to buy them out of Relight U.S. for some time. Relight's negotiations with Plaintiffs proceeded concurrently with its negotiations with Swift. Swift was not initially involved in Relight's negotiations with Plaintiffs, but the parties always contemplated the Relight Price would inform the Cash-Out Price.[51]

---

[47] Birchby Decl. ¶ 18; Birchby Dep. 127–32; Birchby Decl. Ex. 9.

[48] Birchby Decl. ¶ 18; Birchby Decl. Ex. 9.

[49] Birchby Decl. ¶ 18; Birchby Decl. Ex. 8.

[50] Birchby Decl. ¶ 18.

[51] *See* Kuster Decl. Ex. 15 at CCF3624.

In early negotiations, Plaintiffs and Relight agreed the Cash-Out Price would be paid in four payments.[52] Plaintiffs' theory of wrongdoing relies on a November 6 series of emails in which the Baykams proposed paying all that remained owed to Plaintiffs at the third installment and returning any excess at the fourth installment (the "November 6 Emails").[53] Based on Relight's agreement with Swift that the Relight Price would be paid over four milestones,[54] the Baykams proposed to Plaintiffs that by the third milestone, "[y]ou take everything you're still owed."[55] Mauri "accepted" this proposal.[56] The November 6 Emails do not mention Swift, except to the extent that Hakan recognized that "[t]he negotiation with the buyers is continuing every day,"[57] and Mauri acknowledged "it is necessary to immediately

---

[52] *See id.* (indicating that the Baykams and Mauri originally contemplated the Cash-Out price be paid in four payments, tethered to milestone payments the Baykams originally predicted in the Relight Purchase).

[53] *Id.* at CCF3623–26.

[54] *Id.* at CCF3624 (stating "[t]he negotiation with the buyers is continuing every day," and "[t]hey fished out other problems," so "the payment will no longer be in 5 milestones but rather in 4," and "propos[ing]" to Mauri "as follows": "First milestone already agreed[;] Second milestone normal[;] Third milestone you take everything you're still owed[;] Fourth milestones if anything is left over to take, we'll give it to you," but "if you have taken more than you should have, you return it to us[;] We'll take our shareholder loans at the last milestone, but if this milestone doesn't happen we will need to think about a remedial system").

[55] *Id.*; *see also* D.I. 101 at 20–21 n.4.

[56] Mauri Dep. 261–62.

[57] Kuster Decl. Ex. 15 at CCF3624.

reach an agreement on Relight, since this time [Swift is] no longer willing to accept the blackmail of the 'if we don't close now[,] everything falls through[.']"[58]

The Baykams used the Swift transaction as leverage against Plaintiffs, misrepresenting to Mauri as early as November 7 that Swift demanded Plaintiffs sell their shares back to Relight.[59]  But Swift could not have made such a statement: Plaintiffs agreed to sell their shares to Relight before Swift learned Plaintiffs existed in due diligence.[60]  Rather, Swift only pressed its desire to negotiate with a single counterparty after learning Mauri and CCF were stockholders on November 17.[61]

---

[58] *Id.* at CCF3626; *see also* Mauri Dep. 261–62 (recognizing that Swift and its affiliates are not explicitly mentioned in, nor were parties to, the November 6 Emails).

[59] Mauri Dep. 201–05 (discussing emails dated November 7, 2016 that addressed various release provisions in the transaction agreement, and indicating that prior to receiving those emails, Mauri was told by the Baykams that Swift would only buy from Relight, stating: "[W]hat he meant really was the final buyer.  He was saying, Without this, the buyer will not buy.  When we talk about buyer, we talk about Swift because, you know, we were together in the company.  The buyer was not Relight.  Relight was just a fake agreement. . . . [T]he agreement should have been between myself, Relight and Swift.  And then they said, You have to sell because Swift does not want to buy from you, so you have to do, say, mirror agreement with Relight, I mean, fake agreement.  I mean, this one because, in fact, the real agreement would have been—should have been—must have been between myself, Relight on one side and Swift on the other side. . . . I was in Italy.  I was in Milan.  And I have been told by Relight people and by Christian that the Swift—the buyer didn't want to deal with me.  They wanted to deal only with Relight. . . . What I know is that at the very late moment I was told that I had to sell to Relight instead of selling to Swift.").

[60] *See* Kuster Decl. Ex. 11; Kuster Decl. Ex. 12; Birchby Decl. Ex. 8.

[61] *See* Birchby Dep. 148–49 (stating that Swift "didn't tell Relight that they needed to have Cambria sell their shares, but [Swift] did tell them that [it] wanted to deal with a single counterpart and from there Relight dealt with Cambria directly to effect . . . an agreement in which they bought out their counterpart, Cambria," explaining that Swift told the Baykams they preferred to negotiate with a single party because "that's who [Swift had] been dealing with all along," and further stating that Relight told Swift it did not initially

12

Plaintiffs and Relight executed two Common Stock Purchase Agreements (the "SPAs"), which Relight's counsel drafted without Swift's knowledge or input.[62] Plaintiffs did not engage separate counsel.[63] Both SPAs terminate Plaintiffs' ownership in Relight U.S. shares and "any equitable or beneficial ownership in Relight [U.S.] of any nature" upon the Relight Purchase.[64]

The first SPA, dated November 15, was among Relight, CEP, and Mauri (the "November 15 CEP SPA").[65] It implemented the November 6 Emails, providing the Cash-Out Price would be paid with three payments tied to the Relight Price's first three milestone payments contemplated in drafts of the Purchase Agreement, followed by an adjustment.[66] The November 15 CEP SPA was executed before Relight U.S. submitted its due diligence responses to Swift.[67] Relight U.S.

---

disclose CCF as a stockholder because "they were on very familiar terms with Mauri; they were very good friends with him and they do these sort of deals with Cambria all the time").

[62] *See* Kuster Decl. Ex. 11; Kuster Decl. Ex. 12; Kuster Decl. Ex. 17.

[63] *See* Mauri Dep. 246–49.

[64] Kuster Decl. Ex. 11 § 1.2; Kuster Decl. Ex. 12 § 1.2.

[65] Kuster Decl. Ex. 11.

[66] *Id.* § 1.1 & Sched. II.

[67] *See id.*, Preamble & Signature Pages; Birchby Decl. Ex. 8.

did not disclose CEP to Swift or provide Swift with the November 15 CEP SPA.[68]

The November 15 CEP SPA, including its payment schedule, was never amended.[69]

The second SPA, dated November 16, was among Relight, CCF, and Mauri (the "November 16 CCF SPA").[70] The November 16 CCF SPA was substantially more detailed than the November 15 CEP SPA.[71] It similarly keyed the Cash-Out Price off the Relight Price, but did not specify the number of payments.[72]

Swift received a copy of the November 16 CCF SPA on November 17.[73] Swift then sought to limit or eliminate their potential liability to Mauri and CCF, and to deal only with Relight moving forward.[74] Swift's counsel submitted comments to the November 16 CCF SPA, noting that (among other issues) it did not properly reflect the proposed structure of the Relight Sale.[75] Swift also added language that expressly eliminated any claim against Swift or Relight U.S.[76]

---

[68] Birchby Decl. ¶ 18.

[69] *See* Kuster Decl. Ex. 13 (identifying only CCF and Mauri as parties to the final SPA and not mentioning CEP).

[70] Kuster Decl. Ex. 12.

[71] *Compare* Kuster Decl. Ex 11, *with* Kuster Decl. Ex. 12.

[72] *Compare* Kuster Decl. Ex 11 § 1.1 & Sched. II, *with* Kuster Decl. Ex. 12 § 1.1 & Sched. II.

[73] *See* Kuster Decl. Ex. 17.

[74] *See* Kuster Decl. Ex. 20; Birchby Dep. 148–51.

[75] *See* Birchby Dep. 150; Kuster Decl. Ex. 18; Kuster Decl. Ex. 19.

[76] *See* Kuster Decl. Ex. 13 § 1.1; Kuster Decl. Ex. 19; *see also* Mauri Dep. 205–06.

Plaintiffs did not like Swift's comments and additions, but did not expressly reject them.[77] Rather, Mauri requested other changes to the November 16 CCF SPA, which Swift accepted.[78] On November 23, concurrent with the Purchase Agreement, as discussed *infra*, Mauri and CCF executed an amended version of the November 16 CCF SPA, which incorporated Swift and Mauri's changes (the "Amended SPA").[79] The Amended SPA still based the Cash-Out Price on the Relight Price and contemplated payments in an unidentified number of installments.[80] Plaintiffs were no longer stockholders of Relight U.S. as of November 23.[81]

### C. Swift And Relight Complete Their Negotiations, Keeping Plaintiffs Informed.

In the meantime, the Baykams continued to negotiate with Swift regarding the Relight Purchase. Swift and Relight's counsel relayed the Purchase Agreement's

---

[77] *See* Kuster Decl. Ex. 20; Mauri Dep. 118–19, 205–07.

[78] *See* Kuster Decl. Ex. 23; Kuster Decl. Ex. 24.

[79] Kuster Decl. Ex. 13.

[80] *Id.* § 1.1; *see id.* Sched. II ("Stockholder will be entitled to receive solely from the Company in connection with the [Relight Purchase] an amount equal to thirteen percent (13%) of the Net Proceeds once the Company receives the payments from [Swift]. All payments shall be made within two (2) business days of the Company being paid each payment under the [Relight] Purchase Agreement.").

[81] *See* Kuster Decl. Ex. 8 (admitting in RFA No. 7 "that Plaintiffs were not shareholders of Relight U.S. after November 23, 2016").

15

drafts and final version to Plaintiffs.[82]  Plaintiffs were given draft and final terms for the Relight Price, but did little to understand its calculation before signing the Amended SPA.[83]  Plaintiffs did not comment on those drafts before closing on November 23.[84]

Initial drafts of the Purchase Agreement provided a minimum guaranteed purchase price.[85]  As Swift uncovered more issues, the parties agreed to lower the minimum.[86]  For example, the minimum purchase price decreased from $14.6 million in the October LOI to $11.6 million in a November 16 Purchase Agreement draft.[87]  That draft was sent to Plaintiffs for review.[88]

Over the weekend of November 18, Swift and the Baykams met in person to negotiate the Purchase Agreement's final terms.[89]  While Plaintiffs had advance

---

[82] *See, e.g.*, Kuster Decl. Ex. 16; Kuster Decl. Ex. 25.

[83] Mauri Dep. 278–81.

[84] *Id.*

[85] *See, e.g.*, Birchby Decl. Ex. 10 § 2.02 (providing for a "Guaranteed Purchase Price"); Birchby Decl. Ex. 11 § 2.02 (providing for a "Minimum Purchase Price" of approximately $11.6 million); Kuster Decl. Ex. 16 § 2.02 (providing for a various minimum payments).

[86] *See, e.g.*, Birchby Decl. ¶ 22; Birchby Decl. Ex. 11 § 2.02.

[87] Birchby Decl. ¶ 22; Birchby Decl. Ex. 11 § 2.02.

[88] *See* Birchby Decl. Ex 11.

[89] *See* Birchby Decl. ¶ 23 ("Several days after the disclosure of CCF's existence, the Swift Current Energy team, the Baykams, and each parties' counsel met at Sidley's offices in New York to negotiate the final commercial terms required for the transaction, and hopefully to hammer out a deal.  The meeting began on November 18, 2016 and lasted through the weekend."); Birchby Decl. Ex. 11 at SWIFT00002394–95 (discussing in an email chain dated November 16 that Swift and Relight's representatives would be meeting

notice of the meeting, they did not attend or send a representative.[90] The meeting agenda included the status of Relight's shareholders and Swift's wish to proceed with one transactional counterparty.[91] At the meeting, the Baykams told Swift "it would not be an issue, because Mr. Mauri, who controlled CCF, was a friend of theirs and he would not have any issue if the Swift Defendants only wanted to deal with one counterparty on the transaction."[92] Swift had no reason to doubt Relight's representations.[93]

The most heavily negotiated provision was a buyback right that the Baykams demanded, pursuant to which the Project would be returned to Relight U.S. if Swift

---

over the weekend in New York to "work through the final [Purchase Agreement] issues," including new issues Swift discovered with the Project through due diligence); Birchby Dep. 140–52 (discussing the New York meetings over the weekend of November 18, and detailing the various issues Swift and Relight addressed at those meetings in anticipation of closing).

[90] *See* Birchby Decl. ¶ 23 (stating that only Swift and the Baykams attended the New York meeting); Harris Decl. Ex 16 (disclosing to Plaintiffs' counsel that the Baykams engaged in extensive negotiations with Swift's representatives on November 17 and that that there was a closing meeting to take place in New York on November 18, and attaching an email exchange evidencing the negotiated terms and the Purchase Agreement).

[91] Birchby Decl. ¶ 24 ("Among the issues to be resolved was how to proceed given Relight had additional shareholders. We informed the Baykams that we did not want to complicate the negotiations at this late date by having to deal with multiple shareholders, such that we only wanted to have one counterparty for this transaction.").

[92] *Id.*; Birchby Dep. 149 (explaining that the Baykams stated to Swift that they were "on very familiar terms with [Mauri]" and were "good friends with him and they do these sorts of deals with Cambria all the time and it was no big deal").

[93] *See* Birchby Dep. 149.

17

failed to achieve a certain milestone.[94]  Swift agreed to the buyback after Relight included Relight's separate and undeveloped project, Remason, as part of the transaction for no additional cash consideration.[95]

The parties also discussed the minimum guaranteed Relight Price.[96]  In view of uncertainties regarding the Project's estimated nameplate capacity, among other things, Swift and Relight agreed that there would be no minimum Relight Price, and instead agreed to a payment formula based on "Capacity" (as defined in the Purchase Agreement) at each milestone, times $77,500, less a deduction for certain liabilities.[97]  This agreement to remove a minimum Relight Price continued the negotiations' trajectory of lowering that minimum.  That trajectory was reflected in Relight Purchase Agreement drafts Plaintiffs received before they agreed to the Cash-Out and Cash-Out Price via the November 23 Amended SPA.[98]

---

[94] Birchby Decl. ¶ 32; Birchby Dep. 151–52.

[95] *See* Birchby Decl. ¶ 26 ("Eventually, we agreed to that provision after Relight offered to include a second wind farm in Illinois called Project Remason . . . for no additional cash consideration."); *see also* Kuster Decl. Ex. 21 at CCF3935 (explaining to Plaintiffs' counsel in an email dated November 21 that the Baykams included Remason "to convince the sellers to close the deal," and that "Cambria has stakes in Relight US Corp and will receive the percentages already established in Schedule II [of the Amended SPA] in relation to the overall price for the sale of Relight US Corp whether it's Mason or not").

[96] Birchby Decl. ¶ 26 ("[G]iven the uncertainty regarding how much of the land from Project Meridien could be used to develop a viable wind farm, the Swift Defendants and Relight agreed that there would be no minimum Purchase Price.").

[97] *See id.* ¶ 27.

[98] *See, e.g.*, Birchby Decl. Ex. 10 § 2.02; Birchby Decl. Ex. 11 § 2.02; Kuster Decl. Ex. 16 § 2.02; Kuster Decl. Ex. 25 § 2.02.

18

The parties to the Relight Purchase never discussed an alternative transaction structure in which Swift would pay the Baykams a fixed price over three payments.[99] Specifically, no such structure was discussed at the in-person meetings in November 2016.[100]

On November 18, Hakan informed Mauri, via counsel, that "[y]esterday there was a long negotiation with [Swift]."[101] Hakan went on: "From a totally unreasonable initial request . . . we have arrived at this last draft that I attach[.] Please accept it because there are not alternatives[.] We have a closing meeting at 11 this morning in New York . . . This new document needs to be signed."[102]

On November 23, Mauri and CCF executed the Amended SPA, and Swift and Relight executed the Purchase Agreement.[103] Nothing in the Relight Purchase

---

[99] Birchby Decl. ¶ 31 ("At no time before, during or after the in-person meetings in late November 2016 did the Swift Defendants have any discussions with the Baykams or Relight concerning an alternative structure to the transaction pursuant to which the Swift Defendants would pay the Baykams a fixed price over three payments, or anything of the sort. The only purchase price term was the $77,500/MW price we had negotiated and finalized in the October LOI. We eventually dropped the concept of a minimum guaranteed purchase price, however, in light of the ongoing questions regarding whether all of the leases in the original Project Meridien permitted plans could be obtained, and other material impediments to the project actually achieving the first NTP Date. Instead, nameplate capacity would be estimated at the two interim milestones (NTP Date, First Tower Erection Date), and the COD Date payment would be based on actually installed nameplate capacity.").

[100] *See id.*; Birchby Dep. 140–52.

[101] Harris Decl. Ex 16.

[102] *Id.*

[103] *See* Birchby Decl. Ex. 12 [hereinafter "Purchase Agr."]; Kuster Decl. Ex. 13.

Agreement set a minimum purchase price for Project Meridien or for Plaintiffs' Cash-Out Price.[104] Rather, consistent with Swift and Relight's late November negotiations, the Purchase Agreement set the Relight Price via a formula keyed to four payment milestones: closing, the NTP Date, the Turbine Date, and the COD Date.[105]

The first Relight Price payment of $1,750,000 was due at closing, subject to certain adjustments.[106] Plaintiffs received the corresponding Cash-Out Price payment of $438,878.[107] Two intermediate Relight Price payments, at the NTP and Turbine Dates, were keyed off a formula based on "Capacity," defined based on "the expected nameplate capacity of the Project" at that time.[108] Because the Project would not be built at the time of these milestone payments, their Capacity calculation was fluid.[109] The final milestone payment at the COD Date was based on the Project's more concrete "actual installed" nameplate capacity, but even that payment was based on the Project's performance.[110] The COD milestone was also tied to

---

[104] *See generally* Purchase Agr.

[105] *Id.* § 2.02.

[106] *Id.* § 2.02(a).

[107] Compl. ¶ 44.

[108] Purchase Agr. § 2.02(a)–(b); *see also id.* § 1.01 (defining "Capacity"); Birchby Decl. ¶ 27.

[109] *See id.* §§ 1.01, 2.02.

[110] *Id.* §§ 1.01, 2.02; Birchby Decl. ¶ 27.

certain identified "Real Property" on which the Project was expected to be constructed. It did not account for nameplate capacity derived from any additional leases or real property that Swift secured post-closing.[111]

### D. Swift Develops The Project And Sells It; The Baykams Negotiate Faster Payments At A Cost.

After closing, Swift renamed the Project "Project Hilltopper" and added substantial value to it.[112] Swift altered the Project's footprint by adding additional leases and parcels that were not included as a basis for calculating Capacity and the corollary Relight Price.[113] Swift also entered into power purchase agreements with General Motors and Bloomberg;[114] did engineering work to redesign and optimize performance; performed significant physical work on- and off-site; and worked with grid operators and utilities to connect the Project.[115] Plaintiffs periodically asked the Baykams whether the Purchase Agreement's payment milestones had been met.[116]

---

[111] Purchase Agr. § 2.02 & Sched. 3.14; Birchby Decl. ¶ 28.

[112] Birchby Decl. ¶ 33.

[113] *Id.* ¶¶ 28, 33.

[114] *Id.* ¶ 33. In October 2017, with closing on the horizon, Swift received interest from General Motors and Bloomberg to purchase energy from Project Meridien. *See* Harris Decl. Ex. 49. Swift did not reveal this information to Relight or Plaintiffs. Lent Dep. 108–11.

[115] *See* Birchby Dep. 27–29.

[116] *See* Mauri Dep. 274–79.

In early 2017, Swift began to shop the Project.[117] Swift received interest from dozens of potential bidders, and narrowed those bidders to three finalists that submitted final bids in summer 2017.[118] Enel Green Power North America ("Enel") won the bid.[119] Swift and Enel signed a term sheet in August 2017,[120] and finalized the sale on October 31.[121] Enel paid approximately $50 million for the Project.[122] Swift also sold Remason in a transaction renamed "Glacier Sands."[123] Swift made a large profit from both sales.

During the time Swift was shopping the Project in early 2017, Swift had little to no communication with the Baykams. But on April 20, "out of the blue," Relight's consultant contacted Swift's representative via text message, asking to talk.[124] The next day, Relight asked whether Swift would be open to accelerating the next payment due under the Purchase Agreement.[125] Swift stated it was "open

---

[117] Birchby Decl. ¶ 34.

[118] *Id.*

[119] *Id.* Enel is a leading owner and operator of renewable energy plants in North America, operating and developing projects in 23 states and operating roughly 100 plants. Harris Decl. Ex. 51 at CCF5760.

[120] Birchby Decl. Ex. 13; Harris Decl. Ex. 47.

[121] Birchby Decl. ¶ 34.

[122] Hickey Dep. 105.

[123] Birchby Dep. 158–62.

[124] Birchby Decl. ¶ 35; Birchby Dep. 183–84; Birchby Decl. Ex. 14.

[125] Birchby Decl. ¶ 35.

to the concept," but was hesitant: the Project still needed certain permits to become operational, presenting a substantial risk that Swift would not reach the next milestones, and Swift would have to borrow funds to make an accelerated payment.[126] Swift spoke to its lender, and informed it that "potential payments under the initial PSA would have been $8-12.5M."[127] The lower bound reflected the fact that numerous new leases were not included in the Real Property used to calculate the milestone payment Price.[128]

Swift ultimately agreed to Relight's request, and the parties negotiated new terms.[129] The Baykams told Swift that they needed funds for a project in Turkey, and suggested replacing more delayed and contingent milestone payments with earlier payments of certain sums.[130] In exchange, Swift pushed for a price reduction.[131] Ultimately, the parties agreed on two lower defined payments—as opposed to the three formula-based payments that appeared in the Purchase

---

[126] *Id.* ¶¶ 35, 36; *see* Birchby Decl. Ex. 14; Birchby Decl. Ex. 15; Birchby Dep. 181–82, 191–92.

[127] Birchby Decl. Ex. 15 at SWIFT00016136.

[128] Birchby Decl. ¶ 33.

[129] *See* Birchby Dep. 185–86; Birchby Decl. Ex. 16; Birchby Decl. Ex. 17.

[130] Birchby Dep. 185–86.

[131] *See* Birchby Decl. Ex. 14; Harris Decl. Ex. 37. In an April 26, 2017 text message, Relight's representative stated, "I was not able to convince [the Baykams] to fall from 8.5 to 4.5. I got them to fall to 6. And then after much talking got them to fall to 5. They wont [sic] go below that. Structured as 3 now +2 ntp@." Harris Decl. Ex. 37.

Agreement—and a limit on Relight's ability to buy back the Project.[132] On May 1, 2017, Swift and Relight executed the First Amendment to the Purchase Agreement (the "First Amendment"), which reduced the purchase price from approximately $14 million to approximately $6 million and included fixed price payments on two separate dates, as opposed to the three formula-based milestone payments that appeared in the Purchase Agreement.[133]

Relight soon sought a second amendment. On January 4, 2018, Relight asked whether Swift would consider accelerating the remaining payment due under the First Amendment.[134] Swift again agreed, in exchange for a lower price.[135] Swift and Relight executed the Second Amendment to the Purchase Agreement (the "Second Amendment") on January 12.[136] The Second Amendment discounted the remaining payment by $400,000.[137]

Swift's total payment for the Project and Remason was reduced to $6.3 million.[138] Swift also negotiated a release from Relight for any and all claims

---

[132] Birchby Decl. ¶ 37.

[133] Harris Decl. Ex. 38. Relight's counsel and Swift's counsel drafted the First Amendment. *See* Birchby Decl. ¶ 37; Birchby Decl. Ex. 16; Birchby Decl. Ex. 7.

[134] Birchby Decl. ¶ 38; Birchby Decl. Ex. 14. The record does not reflect whether the intermediate payment under the First Amendment was made.

[135] Birchby Decl. ¶ 38.

[136] *Id.*; Birchby Decl. Ex. 19.

[137] Birchby Decl. ¶ 38; Birchby Decl. Ex. 19.

[138] *See* Harris Decl. Ex. 39; Birchby Decl. Ex. 19.

arising out of the Purchase Agreement.[139]  Enel, which was then the managing member of the Project, made the final Purchase Price payment to Relight on January 19.[140]

### E.     Plaintiffs Become Suspicious And File Suit.

In February 2018, Plaintiffs discovered a press release announcing the Project's power purchase agreements with General Motors.[141]  Plaintiffs became concerned that they were not being paid what they were owed under the SPAs, and began asking the Baykams about the Cash-Out Payments.[142]  Neither the Baykams nor Relight responded.[143]  On April 27, Plaintiffs asked Swift about the status of Swift's payments to Relight under the Purchase Agreement.[144]  Swift explained it had made the final payment to Relight under the Second Amendment in January 2018.[145]

---

[139] Birchby Decl. ¶ 38; Birchby Decl. Ex. 19 § 3.3.

[140] Birchby Decl. ¶ 39.

[141] *See* Kuster Decl. Ex. 26; Mauri Dep. 301–06.

[142] *See* Kuster Decl. Ex. 26; Kuster Decl. Ex. 27; Kuster Decl. Ex. 28; Mauri Dep. 301–06.

[143] *See* Kuster Decl. Ex. 26; Kuster Decl. Ex. 27; Kuster Decl. Ex. 28; Mauri Dep. 301–06.

[144] *See* Kuster Decl. Ex. 29.

[145] *See id.*  Plaintiffs rely on two statements allegedly made by or to their representatives on June 12 and July 3, 2019.  *See* Mauri Dep. 48, 55, 65, 68–71; Togni Dep. 141–45, 148–49, 157–59; Kuster Decl. Ex. 30.  Swift argues that those statements are hearsay and are therefore inadmissible on summary judgment.  Plaintiffs have not responded meaningfully to this contention.  I agree with Defendants that the June 12 and July 3 statements are inadmissible hearsay and do not consider them on the Motion.  *See* D.R.E 801(c); *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 367 (Del. Ch. 2008) (acknowledging that the court cannot consider inadmissible hearsay on a motion for summary judgment); *Bagwell*

Plaintiffs filed a Verified Complaint in this Court on July 3, 2019 (the "Complaint") on the theory that the Baykams, Relight, and Swift secretly conspired to unlawfully squeeze out Plaintiffs' minority stake in Relight U.S. by misrepresenting that, in exchange for the sale of their stock, Plaintiffs would receive over $2.9 million—a certain portion of the Relight Price.[146] According to Plaintiffs,

> Unbeknownst to Plaintiffs, and in breach of Relight SA's fiduciary duties owed to the Plaintiffs as minority shareholders, Defendants together secretly planned to renegotiate the terms of the transaction to a substantially lower price after Plaintiffs returned their shares, and after Relight SA became the 100% owner of Relight US (and Project Meridien). . . . Once Plaintiffs were divested of their ownership in Relight US, and Relight SA became the 100% owner of Relight US, Defendants soon executed the secret, second transaction, which *inter alia* had the effect of reducing the amounts Plaintiffs would receive in exchange for their shares by more than half.[147]

---

*v. Prince*, 683 A.2d 58 (Del. 1996) (TABLE) ("Unsupported hearsay testimony, particularly that consisting of conclusory allegations, speculation and conjecture is inadequate to support a motion for summary judgment."); *Williams v. United Parcel Serv. of Am., Inc.*, 2017 WL 10620619, at *4 (Del. Super. Ct. Nov. 9, 2017) (granting motion for summary judgment and concluding that plaintiff could not rely on hearsay within hearsay); *Henry v. Nanticoke Surgical Assocs., P.A.*, 931 A.2d 460, 462 (Del. Super. Ct. 2007) ("The Court should not consider inadmissible hearsay when deciding a Motion for Summary Judgment.").

[146] *See* Compl. ¶¶ 5–6.

[147] *Id.* ¶¶ 6–7.

Count I of the Complaint asserts a breach of fiduciary duty claim against Relight.[148]

Count III asserts an unjust enrichment claim against Relight and Swift.[149] Count II

asserts an aiding and abetting claim against Swift.[150]

Relight failed to appear, and the Court entered a default judgment against it.[151]

Swift moved to dismiss.[152] The Court denied that motion, and this action proceeded

through discovery.[153] On November 10, 2020, Swift moved for summary judgment

on Counts II and III (the "Motion").[154] The parties briefed the Motion as of

December 22.[155] I heard argument on January 5, 2021.[156] With the benefit of the

parties' presentations, I indicated summary judgment would be granted in Swift's

favor, with an opinion to follow.[157] This is that opinion.

## II. ANALYSIS

Pursuant to Court of Chancery Rule 56, summary judgment should be granted

where there are no genuine issues of material fact and the moving party is entitled

---

[148] *Id.* ¶¶ 56–61.

[149] *Id.* ¶¶ 70–77.

[150] *Id.* ¶¶ 62–69.

[151] D.I. 11; D.I. 24; D.I. 30; D.I. 33; D.I. 38; D.I. 39; D.I. 41; D.I. 42.

[152] D.I. 8; D.I. 13; D.I. 25; D.I. 27.

[153] D.I. 38.

[154] D.I. 85; D.I. 86.

[155] D.I. 101; D.I. 103.

[156] D.I. 109.

[157] *See* Hr'g Tr. 66–68.

to judgment as a matter of law.[158]  In deciding a motion for summary judgment, the facts must be viewed in the light most favorable to the nonmoving party, and the moving party has the burden of demonstrating that no material question of fact exists.[159]  "[I]f the moving party puts facts in the record that, if unrebutted, entitle her to summary judgment, the burden shifts to the party opposing summary judgment to dispute the facts by affidavit or proof of similar weight."[160]  "[T]he nonmoving party must submit admissible evidence sufficient to generate a factual issue for trial or suffer an adverse judgment."[161]  "If the nonmoving party fails to introduce countervailing evidence or affidavits, summary judgment may be granted."[162]

---

[158] Ct. Ch. R. 56(c).

[159] *E.g.*, *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 75 (Del. Ch. 2013); *Jacobson v. Dryson Acceptance Corp.*, 2002 WL 75473, at *2 (Del. Ch. Jan. 9, 2002).

[160] *Gilliland v. Motorola, Inc.*, 859 A.2d 80, 85 (Del. Ch. 2004).

[161] *Jacobson*, 2002 WL 75473, at *2 (quoting *Tanzer v. Int'l Gen. Indus., Inc.*, 402 A.2d 382, 385 (Del. Ch. 1979)).

[162] *Gilliland*, 859 A.2d at 85; *see also* Ct. Ch. R. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.").

**A.** **The Record Does Not Support Plaintiffs' Aiding And Abetting Claim Against Swift.**

To prevail on a claim for aiding and abetting breach of fiduciary duty, a plaintiff must prove four elements: (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages proximately caused by the breach.[163] In view of the default judgment entered against Relight, for purposes of today's analysis, I assume Plaintiffs have proven an underlying breach of fiduciary duty to support Count II. Therefore, the primary inquiry at this stage is whether the undisputed record contains sufficient evidence to support a finding that Swift knowingly participated in Relight's fiduciary misconduct.

The "knowing participation" requirement imposes a "stringent standard."[164] It requires that the plaintiff establish the defendant acted with scienter, "an illicit state of mind."[165] The Delaware Supreme Court has stated that "[k]nowing

---

[163] *See, e.g.*, *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015); *RCS Cred. Tr. v. Schorsch*, 2018 WL 1640169, at *5 (Del. Ch. Apr. 5, 2018); *Encite LLC v. Soni*, 2011 WL 5920896, at *26 (Del. Ch. Nov. 28, 2011).

[164] *In re MeadWestvaco S'holders Litig.*, 168 A.3d 675, 688 (Del. Ch. 2017) (quoting *Lee v. Pincus*, 2014 WL 6066108, at *13 (Del. Ch. Nov. 14, 2014)).

[165] *RBC Cap. Mkts.*, 129 A.3d at 862 (quoting *In re Oracle Corp.*, 867 A.2d 904, 931 (Del. Ch. 2004)); *see also MeadWestvaco*, 168 A.3d at 688 ("The knowing participation element of an aiding and abetting claim . . . turns on proof of scienter." (alteration and internal quotation marks omitted) (quoting *Lee*, 2014 WL 6066108, at *13)); *Encite*, 2011 WL 5920896, at *25 (identifying "knowing participation" as "the central question" in considering an aiding and abetting claim on summary judgment, and acknowledging that the record must establish the defendant acted with the requisite state of mind).

29

participation in a . . . fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach."[166] Accordingly, "the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper."[167]

Plaintiffs can prove knowing participation by showing that a bidder attempted to create or exploit conflicts of interests faced by the fiduciary or conspired in or agreed to the fiduciary breach.[168] However, "[a] third-party bidder who negotiates at arms' length rarely faces a viable claim for aiding and abetting."[169] This Court adheres to "the long-standing rule that arm's-length bargaining is privileged and

---

[166] *RBC Cap. Mkts.*, 129 A.3d at 861–62 (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001)); *see also In re Telecomms., Inc. S'holders Litig.*, 2003 WL 21543427, at *2 (Del. Ch. July 7, 2003) ("[I]t is necessary that the plaintiffs make factual allegations from which knowing participation may be inferred in order to survive a motion to dismiss. For example, knowing participation may be inferred where the terms of the transaction are so egregious or the magnitude of side deals is so excessive as to be inherently wrongful. In addition, the Court may infer knowing participation if it appears that the defendant may have used knowledge of the breach to gain a bargaining advantage in the negotiations. The plaintiff's burden of pleading knowing participation may also be met through direct factual allegations supporting a theory that the defendant sought to induce the breach of fiduciary duty, such as through the offer of side payments intended as incentives for the fiduciaries to ignore their duties." (footnotes omitted)).

[167] *RBC Cap. Mkts.*, 129 A.3d at 862 (internal quotation marks omitted) (quoting *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008)).

[168] *E.g.*, *Encite*, 2011 WL 5920896, at *26.

[169] *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 837 (Del. Ch. 2011); *see also Tomczak v. Morton Thiokol, Inc.*, 1990 WL 42607, at *16 (Del. Ch. Apr. 5, 1990) (granting summary judgment in favor of defendant on aiding and abetting claim because "what [defendant] essentially did [in the transaction] was to simply pursue arm's-length negotiations with [the fiduciaries] through their respective investment bankers in an effort to obtain . . . the best price that it could").

does not, absent actual collusion and facilitation of fiduciary wrongdoing, constitute aiding and abetting."[170] A bidder has "the right to work in its own interests to maximize its value," and the plaintiff faces a high burden when asserting an aiding and abetting claim against a transactional counterparty.[171]

Generally, "[a]iding-and-abetting claims are fact intensive and ill-suited for summary judgment,"[172] as "the question of whether a defendant acted with scienter is a factual determination,"[173] and "acts that constitute aiding and abetting can take a variety of forms that can differ vastly in their magnitude, effect, and consequential culpability."[174] However, the Court can grant an alleged aider and abettor's motion for summary judgment where the nonmovant has failed to offer evidence that "[the defendant] participated in the [fiduciary]'s decisions, conspired with [the fiduciary], or otherwise caused the [the fiduciary] to make the decisions at issue,"[175] and

---

[170] *Morgan v. Cash*, 2010 WL 2803746, at *8 (Del. Ch. July 16, 2010).

[171] *Morrison v. Berry*, 2020 WL 2843514, at *11 (Del. Ch. June 1, 2020); *see also In re Rouse Props., Inc.*, 2018 WL 1226015, at *25 (Del. Ch. Mar. 9, 2018).

[172] *In re Good Tech. Corp. S'holder Litig.*, 2017 WL 2537347, at *2 (Del. Ch. May 12, 2017) (ORDER).

[173] *RBC Cap. Mkts.*, 129 A.3d at 862 (emphasis omitted).

[174] *Good Tech. Corp.*, 2017 WL 2537347, at *2 (*In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *41 (Del. Ch. Aug. 27, 2015)).

[175] *Malpiede*, 780 A.2d at 1098.

therefore "there are no facts in the record that would allow the Court to hold [the defendants] as knowledgeable participants."[176]

Summary judgment is entered in favor of Swift on Count II's aiding and abetting claim. Plaintiffs have failed to prove that Swift knowingly participated in a presumed breach by Relight. And to the extent Plaintiffs contend that there are genuine disputes of fact as to scienter, I disagree: the undisputed record demonstrates Swift negotiated at arm's length to further its own interests.

Plaintiffs' aiding and abetting claim is premised on the theory that "Defendants together secretly planned to renegotiate the terms of the transaction to a substantially lower price after Plaintiffs returned their shares, and after Relight SA became the 100% owner of Relight US (and Project Meridien)."[177] In particular, Plaintiffs contend that Swift and Relight met secretly to conspire to pull a bait and switch, altering the Relight Purchase terms at the last minute to eliminate any minimum Purchase Price and shirk the value owed to Plaintiffs. Plaintiffs have offered no concrete support for this theory. As Plaintiffs conceded at argument, the evidence against Swift is circumstantial at best.[178]

---

[176] *Crescent/Mach I P'ship, L.P. v. Turner*, 2005 WL 3618279, at *4 (Del. Ch. Dec. 23, 2005).

[177] Compl. ¶ 6.

[178] Hr'g Tr. 55–64.

The record is devoid of evidence that Swift and the Baykams discussed a Relight Price structure other than the one set forth in the Purchase Agreement before signing it. Plaintiffs point to the November 6 Emails, in which Hakan suggested to Mauri that Plaintiffs be paid the Cash-Out Price over three of the four installments in their SPAs, and return any excess at the fourth milestone. Plaintiffs extrapolate this discussion of the Cash-Out Price payment schedule to the Relight Price schedule, and argue that "Baykam's email hints at his concern about a different deal structure that was being discussed contemporaneously with the terms that were being set forth in the writing."[179] They conclude that that the November 6 Emails evidence a secret deal between Relight and Swift because the Baykams' proposal to pay Plaintiffs in three payments rather than four reflects "the same structure ultimately adopted in the First Amendment, executed a few months later."[180]

But the November 6 Emails do not give rise to aiding and abetting liability. Plaintiffs have not demonstrated that Swift had any reason to know of Hakan's negotiations with Mauri about the Cash-Out Price. Swift was not a party to the November 6 Emails, and did not know Plaintiffs existed at that time.[181] Nor does the substance of the November 6 Emails support a finding of a secret side deal

---

[179] D.I. 101 at 31.

[180] *Id.* at 20–21 n.4.

[181] *See* Kuster Decl. Ex. 15 at CCF3623–26.

between Swift and Relight to Plaintiffs' detriment. Mauri testified that Plaintiffs "accepted" that proposal "at the end" because

> of course, if they were able to reduce the milestone from four to three, that would have been the benefit of everybody. They made reference to the milestone of the [Purchase Agreement] between them and Swift. Were they able to reduce from four to three, why not, it would have been beneficial as well. I would have benefitted as well.[182]

The three milestones and adjustment discussed in the November 6 Emails are reflected in the November 15 CEP SPA signed by Mauri, CEP, and Relight.[183] The November 6 Emails reflect negotiations between Plaintiffs and Relight that did not involve Swift. Plaintiffs' attempt to stretch the November 6 Emails into proof of a secret side deal between Relight and Swift conjures up ghosts in the room that are not there.[184]

Plaintiffs further contend that "[t]he eleventh-hour identification of a minority shareholder in the target corporation was undoubtedly a glaring 'red flag'" that should have caused Swift to consider a minority stockholder's interests under

---

[182] Mauri Dep. 262.

[183] *Compare* Kuster Decl. Ex. 11 Sched. II, *with* Kuster Decl. Ex. 15 at CCF3624.

[184] *See Smith v. Del. State Univ.*, 47 A.3d 472, 477 (Del. 2012) (stating that "[t]his Court will not draw unreasonable inferences in favor of the non-moving party" on a motion for summary judgment); *Cirillo Fam. Tr. v. Moezinia*, 2018 WL 3388398, at *6 (Del. Ch. July 11, 2018) (noting that "the nonmoving party must affirmatively present evidence— not guesses, innuendo or unreasonable inferences—demonstrating the existence of a genuine issue of fact," and that "mere conclusory allegations are insufficient to defeat a motion for summary judgment" (internal quotation marks omitted) (quoting *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *6 (Del. Ch. May 22, 2000))), *aff'd*, 220 A.3d 912 (Del. 2019) (ORDER).

Delaware law.[185]   Plaintiffs also argue the Court can derive Swift's knowing participation from the fact that Swift's counsel participated in negotiating and drafting the SPAs.[186]   But the fact that Swift learned of Plaintiffs in due diligence and responded by seeking protection in the SPAs does not give rise to knowing participation in Relight's purported disloyal squeeze-out.

First, nothing in the record suggests Swift's involvement in the Cash-Out until after Plaintiffs executed the SPAs on November 15 and 16.  To the contrary, the undisputed evidence demonstrates that Swift did not even know about Plaintiffs as Relight U.S. stockholders until November 17, when Swift received Relight U.S.'s completed due diligence questionnaire disclosing CCF (but not CEP).  And Swift did not learn of CEP until after closing.  Second, Plaintiffs have offered no evidence to suggest that Swift knew or should have known that Relight was breaching its duties after Relight disclosed that Mauri and CCF existed.

And third, Swift's conduct upon learning that there were minority stockholders in Relight U.S. is consistent with that of a third party bargaining at arm's length to protect its interests.  Upon learning of the existence of another related party, Swift bargained for protections from Plaintiffs that had nothing to do with Relight.  Swift reasonably sought a liability release from exiting Relight U.S.

---

[185] D.I. 101 at 38.

[186] *See id.* at 35.

stockholders because it would be purchasing Relight U.S. and stepping into its shoes. The terms of that release were extensively negotiated among Swift, Relight, and Plaintiffs. Swift commented on the Amended SPA, and Plaintiffs did nothing to reject Swift's comments or bargain for their own benefit before the Amended SPA was signed on November 23, the same day the Relight Purchase Agreement was executed. The undisputed record shows Swift negotiated aboveboard with Plaintiffs for protective terms that had nothing to do with the Relight Price or Cash-Out Price.[187]

Further, there is not any "evidence of a secret side agreement between the Baykams and Swift Defendants as to pricing of the transaction."[188] Plaintiffs contend that agreement was reached at the November 18 meeting, but Plaintiffs offer no evidence in support. That meeting followed the exchange of multiple drafts that,

---

[187] *See* Harris Decl. Ex. 15 (stating in email dated November 17, 2016 regarding "Meridien PSA: Swift Current Purchase of Relight USA," that the structure of the Relight-Swift deal was negotiated and that the that Swift was insisting on a structure whereby the Cambria parties would be bought out only after learning of their existence); *see also* Hr'g Tr. 60–61 ("I view this email as completely consistent with the narrative that I just shared with you, which is that once CCF was disclosed, Sidley responded by seeking protections for itself. And then, in fact, Relight, in the email above that from Ms. Harmon, wrote back and said, basically, chill out. We are not going along with you on this. You've got to cool your jets a little bit to get this done. So I see this to be the opposite of a secret deal to squeeze out Cambria. I see this as, two weeks before close, Sidley finds out Cambria exists, I think properly seeks protections for itself, and engages in what I think are fairly categorized as adversarial negotiations on this very point with Relight. I don't see how this email supports any sort of secret deal or that Swift initiated the SPA.").

[188] D.I. 101 at 29.

over time, decreased and ultimately eliminated a minimum Purchase Price from the Purchase Agreement; these drafts were shared with Plaintiffs. In addition, Plaintiffs were apprised of the November 18 meeting and were aware that Relight and Swift intended to finalize the deal terms, which were substantially reflected in the drafts Plaintiff received. To the extent Plaintiffs contend that they could not possibly know what was discussed at the meeting, the unrefuted record demonstrates that the parties discussed pending due diligence issues, eliminating the minimum Purchase Price, and loose ends with respect to Plaintiffs' stockholder status. On the final issue, Swift asked the Baykams about Plaintiffs, and the Baykams assured Swift that the Plaintiffs' status had been resolved and that there was no need to be concerned.[189]

And Plaintiffs received the meeting's output, in the form of the final draft of the Purchase Agreement.[190] The Purchase Agreement's plain terms do not provide for any minimum Relight Price or any minimum Cash-Out Price. To the contrary, the Purchase Agreement reflects the parties' extensive due diligence and negotiations in setting a metric to fairly assess the Project's value as a pre- and post-operational asset. Purchase Agreement drafts and correspondence between Relight

---

[189] *See* Birchby Dep. 149.

[190] Hr'g Tr. 61 ("MR. HARRIS: Well, . . . in the first instance, the deposition testimony of Mr. Lent and Mr. Birchby establishes, I believe, that this face-to-face pre-closing meeting between Swift representatives and Relight was not disclosed to any of the Cambria plaintiffs. It seems to me that that, by itself, is suggestive of, certainly, a secretive meeting. THE COURT: But didn't the Cambria parties get a draft of the PSA that came out of that meeting for their review? MR. HARRIS: I believe that's correct.").

and Swift corroborate Swift's position that the minimum Purchase Price was gradually decreased and ultimately eliminated as closing loomed. Plaintiffs received these drafts, and were aware of the Purchase Agreement's terms prior to closing, but did nothing to protect their interests or secure a minimum Cash-Out Price.

When probed, Plaintiffs contend their best support for their secret side deal theory is their contention that Swift knew the Baykams had a liquidity need before executing the Purchase Agreement. Plaintiffs point to the otherwise unremarkable and unrefuted fact that the Purchase Agreement was heavily negotiated, and assert therefore "that in the course of those discussions, the negotiations, [the Court] can reasonably infer that the Swift defendants came to believe or understand that the Baykams were in need of liquidity."[191] Without concrete support, Plaintiffs argue that Swift "must have known."[192]

Nothing in the record supports this position,[193] as the only communications supporting Swift's knowledge of the Baykams' liquidity needs were sent long after

---

[191] *Id.* 55; *see also id.* 56 ("We do submit that Your Honor would have to draw an inference, with respect to that allegation, that the Swift defendants were aware . . . that the Baykams required liquidity.").

[192] *Id.* 56 ("And it really comes, I think, . . . more along the lines of they must have known. And the 'must have known' allegation, I think, at trial, fails; but in the context of a Rule 56 standard of review, which Your Honor well knows requires that the Court view all facts in the light most favorable to the nonmoving party—the plaintiffs here—I think that a 'must have known' inference can and is appropriately drawn.").

[193] *Cf. id.* 56–57 ("Could you please point to anything in the record that supports a pre-close reflection of a liquidity need. MR. HARRIS: I can't point to anything specific, Your Honor.").

closing when the Baykams requested the First Amendment in view of the project in Turkey.[194]  Before closing, the extensive negotiations show that the Baykams were content with a protracted milestone structure and were seeking other benefits like a buyout right, not a lower, quick-cash price.  The Baykams did not approach Swift for quick cash until after closing.

And to the extent Plaintiffs see evidence of a secret deal in the First and Second Amendments, the record does not support their theory.  Rather, the record reflects that Relight alone spurred the First and Second Amendments, without pressure or involvement from Swift.  Swift received Relight's amendment proposals, and was hesitant to amend the Purchase Agreement's payment schedule.  But as an arm's-length acquirer, Swift expressed a willingness to entertain Relight's offer, twice negotiated for more favorable terms, and acted on an opportunity to secure a more lucrative deal, as it was entitled to do.

---

[194] Plaintiffs also point to an early November text message that stated:  "Baykams said they dont [sic] have the cash.  Simple as that."  Harris Decl. Ex. 37; D.I. 101 at 9–10.  But this message was sent to a Relight consultant to explain the Baykams' inability to pay for a trip the consultant requested.  *See* Kuster Decl. Ex. 31; Purchase Agr. § 2.02, App. I.  This single text does not support an inference of a broader liquidity problem.  And even if the Baykams were in a liquidity crunch, they bargained aggressively with Swift, not as though they were desperate for cash.  On the contrary, they refused to agree to a change in the $77,500/MW price term based on certain variances; refused to agree to drop their buyback right for one dollar if the Swift Defendants failed to achieve a Purchase Agreement milestone; and repeatedly told Swift they were willing to walk away from deal throughout the parties' four months of negotiations.  *See, e.g.*, Birchby Decl. ¶¶ 15, 20.

At bottom, there are no facts in the record that satisfy Delaware's stringent scienter requirement and allow the Court to hold Swift liable as knowing participants in Relight's fiduciary breach. Nothing suggests that Swift had actual or constructive knowledge that Relight's conduct was legally improper or that Swift created or attempted to exploit any Relight conflicts or breaches. Rather, the record indicates Swift was a third-party bidder that negotiated at arms' length to secure for itself the best deal prior to closing. And after closing, when the Baykams asked Swift to pay sooner, Swift rightfully took advantage of the chance to bargain for a lower purchase price. Finally, that Swift benefitted from developing and flipping the Project, especially in view of the First and Second Amendments, is of no moment without evidence indicating that there was any nefarious side deal. Swift had the "the right to work in its own interests to maximize its value," and Plaintiffs have failed to carry the high burden of establishing aiding and abetting.[195]

### B. The Record Does Not Demonstrate That Swift Was Unjustly Enriched.

"Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[196] "The elements of unjust enrichment

---

[195] *Morrison*, 2020 WL 2843514, at *11; *see also Rouse Props.*, 2018 WL 1226015, at *25.

[196] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (internal quotation marks omitted) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)).

are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[197] "[B]enign participation cannot support the plaintiff's unjust enrichment claim. The linchpin of an unjust enrichment claim is an absence of justification for the defendant's enrichment. Where an investor is only alleged to have participated in a transaction without any knowledge of wrongdoing, its bargained-for benefit is justified, barring circumstances that would render the benefit unconscionable."[198] Accordingly, aiding and abetting and unjust enrichment claims often rise and fall together.[199]

Summary judgment is entered in favor of Swift on Count III's unjust enrichment claim. Plaintiffs argue that "[t]he evidence demonstrates that Swift Defendants were unjustly enriched by their knowing and active participation in Relight['s] breach of fiduciary duties, which deprived Cambria Plaintiffs of the fair value of their interests in Relight US."[200] Count III is based on the same facts and circumstances as the failed aiding and abetting breach of fiduciary duty claim.[201]

---

[197] *Id.* (quoting *Fleer Corp.*, 539 A.2d at 1062).

[198] *Jacobs v. Meghji*, 2020 WL 5951410, at *1 (Del. Ch. Oct. 8, 2020).

[199] *In re Molycorp, Inc. S'holder Deriv. Litig.*, 2015 WL 3454925, at *11 (Del. Ch. May 27, 2015); *see also, e.g.*, *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 657 (Del. Ch. 2008); *Jackson Nat. Life Ins. Co. v. Kennedy*, 741 A.2d 377, 394 (Del. Ch. 1999); *cf. NuVasive, Inc. v. Miles*, 2020 WL 5106554, at *12 (Del. Ch. Aug. 31, 2020).

[200] D.I. 101 at 40.

[201] *See Molycorp*, 2015 WL 3454925, at *11; *see also* D.I. 101 at 40–41.

Those claims accordingly fall together, as Plaintiffs have not established an absence of justification in view of a record demonstrating that Swift negotiated at arm's length.

## III.  CONCLUSION

Swift's Motion is **GRANTED** as to Counts II and III against Swift.