**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

NATHAN A. COOK
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

Date Submitted: June 20, 2024
Date Decided: December 2, 2024

Samuel T. Hirzel, II, Esquire
Elizabeth A. DeFelice, Esquire
Heyman Enerio Gattuso & Herzel LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801

Kevin G. Abrams, Esquire
Eric A. Veres, Esquire
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807

Kevin M. Coen, Esquire
Kirk C. Andersen, Esquire
Morris, Nichols, Arsht, Tunnell LLP
1201 North Market Street
Wilmington, DE 19801

Kevin M. Gallagher, Esquire
Edmond S. Kim, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801

RE: ***Chatham Holdings VI, LLC v. Adam Hermida, et al.,***
Civil Action No. 2023-0037-NAC

Dear Counsel:

This letter addresses Defendants'[1] motion to dismiss the plaintiff's claims (the "Motion"). For the reasons below, the Motion is granted.

## I. BACKGROUND

Plaintiff Chatham Holdings VI, LLC ("Chatham") is a beneficial and record stockholder of Coral Acquisition, Inc. ("Coral"), a private, closely held Delaware

---

[1] The "Defendants" are Adam Hermida, Christopher McFadden, David Posnick, Gunjan Bhow, Jay Krueger, Lauren Krueger, Thomas Warsop III, Blackstone, Inc., Kohlberg Kravis Roberts & Co. L.P., and Nominal Defendants Coral Acquisition, Inc., and One Call Corporation.

corporation.[2] One Call Corporation ("One Call," or the "Company") is a wholly owned subsidiary of Coral that provides healthcare solutions for the workers' compensation industry.[3] Chatham, Blackstone, Inc. ("Blackstone") and Kohlberg Kravis Roberts & Co. L.P. ("KKR") are debt holders of One Call that became principal stockholders of Coral in October 2019 through a comprehensive recapitalization of One Call facilitated by a $375 million conversion of debt to equity.[4]

In January 2020, One Call's board (the "Board") was reconstituted to include the then-CEO, a purportedly independent Board member, and six representatives from One Call's new stockholder group.[5] Another purportedly independent Board member was added in April 2021, rounding out One Call's current nine-member Board structure.[6]

---

[2] *Chatham Hldgs. VI, LLC v. Adam Hermida, et al.*, C.A. No. 2023-0037-NAC, Docket ("Dkt.") 46, Verified Second Amended Complaint ("SAC") ¶ 10. At this motion to dismiss stage, I draw the relevant facts from the Second Amended Complaint and documents that are "incorporated by reference" or "integral" to it. *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004). In connection with Chatham's Section 220 demand, the parties agreed that "[a]ll Produced Documents shall be deemed to be incorporated by reference into any complaint that the Stockholder or the Director file related to the issues raised in the Demand." SAC Ex. 6 at Ex. A ¶ 8. Citations in the form of "Tr. __" refer to the oral argument transcript from the hearing on June 20, 2024. Dkt. 79.

[3] SAC ¶¶ 13-14.

[4] *Id.* ¶ 24. Blackstone and KKR do not own Coral stock directly, but are alleged to hold Coral stock through several subsidiaries and One Call debt through investment fund vehicles. SAC ¶¶ 15, 16.

[5] *Id.* ¶ 25. Chatham, Blackstone and KKR appointed two directors each to the Board. *Id.*

[6] *Id.*

### A. One Call Struggles During The COVID-19 Pandemic.

One Call's business was compromised during the COVID-19 pandemic, as remote work limited the need for workers' compensation healthcare solutions.[7] The Chatham Board designees proposed that One Call apply for relief from the Paycheck Protection Program, but the rest of the Board did not support the idea.[8] One Call resorted to furloughing approximately 200 employees during the pandemic, which hindered its ability to recover when the business began to ramp up after the COVID-19 vaccine became available.[9]

On April 21, 2021, Chatham agreed to commit $70 million towards a refinancing and to provide an additional $10 million towards a $60 million revolving loan facility.[10] Despite the refinancing, One Call's performance continued to decline, resulting in cash flow issues.[11] In or about January 2022, the Company drew down on its revolver by $20 million.[12] On July 22, 2022, the Company again drew down on its revolver by borrowing $8 million.[13]

During the COVID-19 pandemic there were attempts to market One Call to

---

[7] SAC ¶ 27.

[8] *Id.* ¶¶ 28-29.

[9] *Id.* ¶¶ 29-30.

[10] *Id.* ¶ 32. KKR committed $25 million towards the first lien refinancing; Blackstone did not participate. *Id.*

[11] *Id.* ¶ 33.

[12] *Id.*

[13] *Id.* ¶ 36.

other investors. In or around early 2021, Blackstone and KKR began to market One Call to Ariel Investments in an effort to improve One Call's standing from an environmental, social and governance perspective.[14] Ultimately, Ariel Investments did not invest in One Call.[15] In or around July 2022, One Call also explored a sale to Enlyte Health. In August 2022, Enlyte Health informed the Company that it was no longer interested in a transaction because it could not take on One Call's leverage.[16]

### B.    Chatham Proposes A Debt Restructuring.

In or around May 2022, one of Chatham's Board designees, Feisal Alibhai, began to raise concerns about the Company's liquidity situation.[17] He raised several informal proposals, including interest rate hedges, which the Board chose not to pursue.[18] During a July 2022 Board meeting Mr. Alibhai again suggested interest rate hedges and other methods of addressing rising interest rates, which the Board again chose not to pursue.[19] One of the Blackstone Board designees, David Posnick, instead proposed that Blackstone, KKR, and Chatham buy back $5 million of debt on the open market.[20]

In or around August 2022, Chatham proposed a transaction whereby it would

---

[14] *Id.* ¶ 31.

[15] *Id.*

[16] *Id.* ¶ 37.

[17] SAC ¶ 38.

[18] *Id.*

[19] *Id.* ¶ 39.

[20] *Id.*

retire its share of the Company's aggregate principal amount of term loans ("First Lien Debt") "for second lien bonds [] at par face value."[21]  Chatham estimated that this proposal would allow One Call to save $7 million in annual cash interest expense, as well as materially reducing leverage at the top of the Company's capital structure and improving the Company's ratio of floating-rate to fixed-rate debt.[22]  Mr. Alibhai proposed this transaction to the Blackstone and KKR Board designees, Mr. Hermida and Christopher McFadden, who were initially receptive to the proposal.[23]

Mr. Alibhai then requested that a managing director at KKR, Craig Fitt, run the proposal by his contacts at the credit rating agencies.  Mr. Fitt reported that, to avoid treatment of the transaction as a selective default, the transaction should be structured as a retirement of First Lien Debt at par using proceeds from the issuance of new 8.50% PIK / Toggle Notes due in 2028 ("Second Lien Debt").[24]  Mr. Alibhai, believing that Chatham's proposal now had approval from Blackstone, KKR, and the credit rating agencies, requested that Company counsel from Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") and One Call's Chief Legal Officer prepare paperwork for the transaction that became the "Cash Flow Proposal."[25]

On or around September 16, 2022, documentation reflecting the Cash Flow

---

[21] *Id.* ¶¶ 1, 40.

[22] *Id.* ¶ 40.

[23] *Id.* ¶ 42.

[24] *Id.* ¶¶ 1, 43.

[25] *Id.* ¶ 44.

Proposal was circulated to the Board. Paul Weiss provided an opinion "blessing" the Cash Flow Proposal from a legal perspective, and Jay Krueger, One Call's CEO, indicated that the Company was "supportive."[26] Chatham told the Board that other One Call debt holders could join the Cash Flow Proposal, but Blackstone and KKR indicated that they would be unable to participate in the transaction.[27]

In subsequent discussions the One Call Board raised possible issues with the Cash Flow Proposal. On or around September 17, 2022, Mr. Posnick asked for a full Board discussion on the Cash Flow Proposal and expressed reservations.[28] During a Board call on September 22, 2022, Mr. Posnick questioned whether the proposal was "self-dealing" on behalf of Chatham and requested more time to review the Cash Flow Proposal with Blackstone's investment committee.[29] During the course of discussions surrounding the Cash Flow Proposal, on or around September 27, 2022, Moody's downgraded One Call from B3 to Caa1.[30]

On or around October 6, 2022, Chatham requested that the Board formally

---

[26] *Id.* ¶ 45.

[27] *Id.* ¶ 48. Blackstone and KKR's inability to participate in the Cash Flow Proposal forms the basis for the entities' alleged conflict. Chatham alleges that the Cash Flow Proposal would have "substantially dilute[d]" Blackstone and KKR's ownership in Second Lien Debt by "approximately 3% each," which could have resulted in decreased ownership and control of the Company after a hypothetical future bankruptcy. *Id.* ¶ 49.

[28] *Id.* ¶ 47.

[29] *Id.* ¶ 50.

[30] *Id.* ¶ 46.

consider the Cash Flow Proposal.[31]  The Board then held an *ad hoc* call on October 17, 2022, where it received presentations from several Board members and advisors including Mr. Alibhai on the terms of the proposal, Mr. Krueger on management's perspective, Paul Weiss on legal analysis, KKR on rating agency considerations, and Goldman Sachs on the potential impact of the transaction on trading levels of the First Lien Debt.[32]  Paul Weiss found no legal impediment to the Cash Flow Proposal[33], but Mr. Krueger's report expressed concerns that the Cash Flow Proposal would be viewed negatively by the credit rating agencies and One Call's customers.[34]

The Board voted on the Cash Flow Proposal on October 17, 2022.[35]  The Chatham designees recused themselves from the vote.[36]  Mr. Krueger abstained from voting on the Cash Flow Proposal, to avoid the appearance of a conflict given that Chatham had vouched for his appointment as CEO.[37]  The six remaining directors voted unanimously against the Cash Flow Proposal.[38]

---

[31] *Id.* ¶ 51.

[32] *Id.*

[33] *Id.* ¶ 52; Dkt. 54, Transmittal Affidavit of Edmond S. Kim in Supp. of the Opening Br. in Supp. of Defs.' Mot. to Dismiss Pl.'s Verified Second Am. Compl. ("Kim Aff. __") Ex. F.

[34] SAC ¶ 54.

[35] *Id.* ¶ 53.

[36] *Id.*

[37] *Id.* ¶ 54.

[38] *Id.* ¶¶ 53, 55.

### C. The Board Forms A Working Group And Replaces Paul Weiss.

After the Cash Flow Proposal was rejected, on or around October 21, 2022, Chatham wrote a letter to the Board requesting that it provide alternative proposals to support One Call's debt trading levels.[39]  Mr. Warsop, the then-Executive Chairman of the Board, responded to the letter on October 26, 2022, but did not provide any substantive alternative proposals.[40]

On or around October 27, 2022, Mr. McFadden proposed that the Board create a working group to develop alternatives to optimize One Call's capital structure.[41] The working group comprised Mr. Posnick, Ms. Krueger, Mr. Alibhai, and Steven Davis as a management representative.[42]  Ultimately, the working group was disbanded without developing an alternative to the Cash Flow Proposal.[43]

On or around December 8, 2022, the Company executed a written consent to terminate Paul Weiss and engage White & Case LLP.[44]  Because the written consent was not executed by Mr. Alibhai or Mr. Vom Brack, Chatham alleges that the written

---

[39] *Id.* ¶ 56.

[40] *Id.* ¶ 57.

[41] *Id.* ¶ 58.

[42] *Id.*  The working group was specifically authorized to consider input from resources including Mr. Fitt, Goldman Sachs, KKR Capital Markets, and Blackstone Capital Markets. *Id.*

[43] *Id.* ¶ 61.

[44] *Id.* ¶ 62.

consent did not comply with 8 Del. C. 141(f).[45]

### D. Chatham Brings This Action.

On December 7, 2022, Chatham made a demand under 8 *Del. C.* § 220 to inspect One Call's books and records.[46] On January 13, 2023, Chatham filed a complaint without making a pre-suit litigation demand.[47] When Chatham filed its complaint, the Coral board of directors had nine members (the "Demand Board").[48]

On February 8, 2023, Defendants moved to dismiss the original complaint.[49] On May 11, 2023, Chatham responded to the motion to dismiss with an amended complaint.[50] Defendants moved to dismiss the amended complaint on May 25, 2023.[51] On August 3, 2023, Chatham again responded to the Defendants' motion to dismiss

---

[45] *Id.* Despite alleging that the written consent was executed in violation of Delaware statutory law, Chatham does not bring any claims challenging the written consent or the removal of Paul Weiss as Company counsel.

[46] SAC ¶ 63; *see generally* SAC Ex. 3.

[47] Dkt. 1.

[48] SAC ¶ 69. The parties agree that the operative board for the litigation demand was the Coral board. *Id.* ¶ 68; Dkt. 53, Opening Br. in Supp. of Defs.' Mots. to Dismiss Pl.'s Verified Second Am. Compl. at 25 n.7. When this action was filed the Demand Board comprised Chatham's two Board designees (Feisal Alibhai and Tony Hunter), KKR's two Board designees (Defendants Lauren Krueger and Christopher McFadden), Blackstone's two Board designees (Defendants Adam Hermida and David Posnick), and three purportedly unaffiliated directors (Paul Dascoli and Defendants Jay Krueger and Gunjan Bhow). SAC ¶ 69.

[49] Dkts. 11-13. Defendants filed an opening brief in support of their motions to dismiss the original complaint on March 27, 2023. Dkt. 19.

[50] Dkt. 28.

[51] Dkts. 31-33. On June 29, 2023, Defendants filed an opening brief in support of their motions to dismiss the amended complaint. Dkt. 40.

by filing the Second Amended Complaint.[52]  The Second Amended Complaint now asserts derivative claims for (i) breach of fiduciary duty against the Director Defendants who served at the time the Chatham made its Cash Flow Proposal, and (ii) aiding and abetting against Blackstone and KKR.[53]  On August 17, 2023, Defendants moved to dismiss the Second Amended Complaint.[54]  On September 14, 2023, Defendants filed their opening brief arguing that the Second Amended Complaint should be dismissed for failure to plead demand futility, among other grounds.[55]  I held a hearing on the Motion on June 20, 2024.

## II.    ANALYSIS

"A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."[56]  But in a derivative suit "a stockholder seeks to displace the board's

---

[52] *See generally* SAC.

[53] *Id.* ¶¶ 79-92.

[54] Dkts. 50-52.

[55] Dkt. 53.

[56] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984).  In *Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del. 2000), the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent that they reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review.  *Id.* at 253 n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch.*, 701 A.2d 70, 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 473 A.2d at 814).  The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be de novo and plenary.  *Brehm*, 746 A.2d at 254.  The seven partially overruled precedents otherwise remain good law.  This decision does not rely

authority over a litigation asset and assert the corporation's claim."[57]  Because of this,

Court of Chancery Rule 23.1[58] requires that a derivative plaintiff "allege with

particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff

desires from the directors or comparable authority and the reasons for the plaintiff's

failure to obtain the action or for not making the effort."[59]

"[T]he demand requirement is not excused lightly."[60]  If the plaintiff files an

action without making a pre-suit demand on the board, "the [c]omplaint must be

dismissed unless it alleges particularized facts showing that demand would have

---

on any of them for the standard of appellate review.  Having described *Brehm*'s relationship to these cases, this decision omits their cumbersome subsequent history.

More recently, the Delaware Supreme Court displaced the alternative tests for demand futility set out in *Aronson* and *Rales v. Blasband*, 634 A.2d 927 (Del. 1993).  *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg* (*Zuckerberg II*), 262 A.3d 1034, 1059 (Del. 2021).  The high court adopted a single, unified test for demand futility.  Although the *Zuckerberg* test displaced the prior tests, the Court stated that cases properly applying *Aronson* and *Rales* remain good law.  *Id.*  This decision therefore does not identify any precedents as having been overruled by *Zuckerberg II*.

[57] *United Food & Com. Workers Union v. Zuckerberg* (*Zuckerberg I*), 250 A.3d 862, 876 (Del. Ch. 2020) (citing *Aronson*, 473 A.2d at 811).

[58] Rule 23.1 has been amended twice since this action was filed.  *In re: Amendments to Rules 7, 10, 17–25, and 171 of the Court of Chancery Rules, Sections, III, IV, and XVI* (Del. Ch. Sept. 25, 2023) (ORDER); *In re: Amendments to Rules 1–6, 8, 9, 11–15, 23, 23.1, 79, 79.1, 79.2 and 174 of the Court of Chancery Rules, Section I, II, III, IV, X, and XVI* (Del. Ch. May 31, 2024) (ORDER); *In re: Amendments to Rules 1–6, 8, 9, 11–15, 23, 23.1, 79, 79.1, 79.2 and 174 of the Court of Chancery Rules, Section I, II, III, IV, X, and XVI* (Del. Ch. July 12, 2024) (ORDER). Although neither amendment made any substantive revisions to the relevant portion of Rule 23.1, I will proceed under the Rules as they were drafted at the time this action was filed.  *See Lebanon Cty. Empls.' Ret. Fund v. Collis*, 311 A.3d 773, 780 n.19 (Del. 2023).

[59] *Zuckerberg II*, 262 A.3d at 1049 (quoting Ct. Ch. R. 23.1).

[60] *Id.*

been futile."[61]  Pleadings under Rule 23.1 "must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a)."[62]  The Court must still accept all well-pleaded allegations as true and "[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged."[63]  But "[u]nder the heightened pleading requirements of Rule 23.1, 'conclus[ory] allegations of fact or law not supported by the allegations of specific fact may not be taken as true.'"[64]

When evaluating allegations of demand futility, the Court must ask, on a director-by-director basis,

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand. [65]

If at least half of the members of the Demand Board fall into one of the above categories, then demand is excused as futile.[66]

---

[61] *Ryan v. Gursahaney*, 2015 WL 1915911, at *5 (Del. Ch. Apr. 28, 2015) (citation omitted).

[62] *Brehm*, 746 A.2d at 254.

[63] *Zuckerberg I*, 250 A.3d at 877 (quoting *Brehm*, 746 A.2d at 255).

[64] *Id.* at 876 (quoting *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988)).

[65] *Zuckerberg II*, 262 A.3d at 1059.

[66] *Id.*

Because there were nine members of the Demand Board, Chatham must adequately plead that at least five members of the Demand Board could not impartially consider a litigation demand. Chatham only challenges the independence of six out of the nine members of the Demand Board.[67] Assuming without deciding that the Blackstone and KKR designees were not impartial,[68] Chatham must still plead that one other member of the Demand Board was conflicted. Because Chatham has not pled particularized facts showing that either Mr. Bhow or Mr. Krueger was not disinterested and independent, Chatham has failed to plead sufficiently that demand was excused.

### A. Mr. Bhow.

Chatham alleges that Mr. Bhow cannot disinterestedly and independently consider a demand solely on the basis that he "faces a substantial likelihood of liability due to his failure to properly consider the Cash Flow Proposal."[69]

---

[67] SAC ¶ 71. Chatham challenges the independence of the Blackstone Board designees (Mr. Hermida and Mr. Posnick), the KKR Board designees (Ms. Krueger and Mr. McFadden), the CEO (Mr. Krueger), and Mr. Bhow. *Id.* ¶¶ 72-77.

[68] Chatham argues that the Blackstone and KKR designees could not impartially consider a demand because (i) they lacked independence from Blackstone and KKR, who were allegedly interested in the Cash Flow Proposal, and (ii) they faced a substantial likelihood of liability for rejecting the Cash Flow Proposal. *Id.* ¶¶ 72-75. I need not reach these arguments, given my conclusion that Chatham has failed to plead that demand was excused as to Mr. Bhow or Mr. Krueger.

[69] SAC ¶ 77. Chatham also argues that entire fairness should apply to its claims. Dkt. 63, Plaintiff Chatham Holdings VI, LLC's Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("AB") at 33-35. I need not reach this argument. "[T]he fact that entire fairness may govern the underlying claim does not give rise to substantial likelihood of liability for purposes of considering a demand *unless* the complaint pleads facts sufficient to raise a reasonable doubt that the director would not be entitled to exculpation." *Zuckerberg I*, 250 A.3d at 888-889.

Coral's Certificate of Incorporation exculpates directors "[t]o the fullest extent permitted under the DGCL."[70] Because "exculpated care violations no longer pose a sufficient threat to excuse demand," and because Chatham does not plead Mr. Bhow was interested in the Cash Flow Proposal, Chatham must plead bad faith.[71] "[A] showing of bad faith in the context of demand excusal is a high hurdle, and essentially requires the plaintiff to demonstrate intentional wrongdoing by the board."[72] A plaintiff can plead bad faith by showing either "[(i)] an extreme set of facts to establish that disinterested directors were intentionally disregarding their duties or [(ii)] that the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[73] "Crucially, bad faith requires a showing that 'the directors acted with scienter, meaning they had

---

Even where entire fairness is the operative standard of review, "[w]hen a corporation has an exculpatory provision and a self-dealing transaction has been determined to be unfair, 'only the self-dealing director [is] subject to damages liability for the gap between a fair price and the deal price without an inquiry into his subjective state of mind.'" *Id.* at 882.

[70] Kim Aff. Ex. I at Article IX.

[71] *Zuckerberg II*, 262 A.3d at 1057; 8 Del. C. § 102(b)(7). Chatham does not plead that Mr. Bhow violated his duty of loyalty beyond conclusory allegations of bad faith. Indeed, the only mention of loyalty is Chatham's argument that "[t]o the extent that all the Director Defendants are found to have acted in bad faith in failing to approve the Cash Flow Proposal, they are likewise liable for breach of their fiduciary duty of loyalty." AB at 48. As described in this decision, Chatham has failed to adequately allege a bad faith breach of duty. Accordingly, there is no basis to find that Mr. Bhow breached his fiduciary duty of loyalty.

[72] *McElrath v. Kalanick*, 224 A.3d 982, 993 (Del. 2020).

[73] *Newman v. KKR Phorm Invs., L.P.*, 2023 WL 5624167, at *7 (Del. Ch. Aug. 31, 2023) (quoting *In re MeadWestvaco S'holders Litig.*, 168 A.3d 675, 684 (Del. Ch. 2017)).

actual or constructive knowledge that their conduct was legally improper.'"[74] "[T]here is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties."[75]

None of Chatham's allegations demonstrate bad faith on behalf of Mr. Bhow in voting to reject the Cash Flow Proposal. Chatham makes no particularized allegations against Mr. Bhow. His name appears only nine times in the Second Amended Complaint, and he is not specifically alleged to have taken any action at all. Instead, Chatham relies on general allegations that Mr. Bhow (i) "did not properly consider the information available"; (ii) "failed to implement any measures to eliminate the Conflicted Directors' conflicts of interest"; and (iii) "neglected to consider any alternatives to the Cash Flow proposal."[76] Chatham's allegations are seemingly predicated on the idea that the Cash Flow Proposal was such a good deal that it could not have been rejected for any reason other than bad faith.

---

[74] *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *11 (Del. Ch. Mar. 19, 2018) (quoting *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017)).

[75] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009).

[76] SAC ¶ 77(a). Aside from these allegations, Chatham devotes much of its briefing to an argument that the Board heard presentations from "conflicted advisors and focused on tangential issues." AB at 40-44. This argument rings hollow, given that Chatham made its own presentation to the Board and Chatham's designees were in the room during the other presentations. Further, Chatham cannot unilaterally decide what is relevant, and Chatham acknowledges that several of the presentations did address what it considers the "most pivotal implication of the Cash Flow Proposal"—the alleged reduction in One Call's cash interest payments. *Id*. at 42; *see, e.g.*, *Id*. at 43 ("the slides for Goldman Sachs' presentation reflect its estimation that the Cash Flow Proposal would have saved One Call nearly $6 million in cash interest payments per year."); *Id*. at 44 ("the [KKR] presentation noted that cash interest would decrease from $66 million to $60 million").

Chatham's allegations amount to little more than disagreement with the Board's decision to reject the Cash Flow Proposal. "Mere disagreement with the Board's ultimate decision . . . does not show bad faith by the Board members."[77] Further, Chatham provides no legal basis to support its position that rejecting the Cash Flow Proposal was inherently bad faith, or that the Board was obligated to propose some alternative. Chatham has provided no case law imposing an affirmative obligation for a board to act in this situation.[78]

Chatham's conclusory allegations do not meet the particularity standard required under Rule 23.1, nor do they meet the high standard required to plead bad faith.[79] Accordingly, Chatham has failed to plead that Mr. Bhow faces a substantial likelihood of liability.

### B. Mr. Krueger.

Chatham alleges that Mr. Krueger cannot disinterestedly and independently consider a demand because he "has shown a lack of independence" from Blackstone and KKR and "faces a substantial likelihood of liability due to his failure to properly

---

[77] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *23 (Del. Ch. Oct. 24, 2014); *Simons v. Brookfield Asset Mgmt. Inc.*, 2022 WL 223464, at *13 (Del. Ch. Jan. 21, 2022) ("Plaintiff's allegations simply register disagreement with the [transaction], but mere disagreement does not give rise to a substantial likelihood of liability for disloyalty or bad faith." (citing *Zuckerberg I*, 250 A.3d at 897)).

[78] Tr. at 47-49 ("Your Honor, to your question, I cannot say there is an affirmative duty to restructure debt.").

[79] *Genworth Fin. Consol. Deriv. Litig.*, 2021 WL 4452338, at *22 (Del. Ch. Sept. 29, 2021) ("Because Plaintiffs have not pled with particularity that Defendants face a substantial likelihood of liability, demand is not excused.").

consider the Cash Flow Proposal."[80]  Chatham does not allege that Mr. Krueger was self-interested in the Cash Flow Proposal, nor does Chatham allege that Mr. Krueger is conflicted because of his role as CEO.[81]

Chatham has alleged that Mr. Krueger is not independent from Blackstone and KKR.[82]  Assuming without deciding that Blackstone and KKR were conflicted as to the Cash Flow Proposal, conclusory allegations that Mr. Krueger lacks independence are still insufficient for Chatham to plead demand futility.[83]  Chatham pleads that Mr. Krueger "failed to endorse [the Cash Flow Proposal] to the Board in order to avoid an appearance that he was siding with Chatham."[84]  This allegation not only fails to plead with required particularity that Mr. Krueger was beholden to Blackstone and KKR, but seems to suggest that Mr. Krueger lacked independence from Chatham.  Regardless, simply siding with Blackstone and KKR is insufficient

---

[80] SAC ¶ 76.

[81] Near the conclusion of oral argument, Chatham's counsel attempted to argue by inference that Mr. Krueger was conflicted because his role as CEO was threatened by his support of Chatham's Cash Flow Proposal.  But Chatham's counsel conceded that argument was not in its briefing, and so the argument is waived.  Tr. at 86-88.

[82] SAC ¶ 76.

[83] *Kandell on behalf of FXCM, Inc. v. Niv*, 2017 WL 4334149, at \*14 (Del. Ch. Sept. 29, 2017) ("'conclusory allegations of domination and control are insufficient to excuse pre-suit demand.' . . . Instead, the plaintiff must allege 'particularized facts showing that an individual person or entity interested in the transaction controlled the board's vote on the transaction.'") (citations omitted).

[84] SAC ¶ 76(a).

to demonstrate a disabling conflict.[85]  Chatham also alleges that "[o]n information and belief, [Blackstone and KKR] pressured CEO Krueger to terminate the Company's relationship with Paul Weiss."[86]  But I need not make unreasonable inferences or accept allegations contradicted by documents incorporated by reference into the Second Amended Complaint.  The written consent attached as Exhibit 2 to the Second Amended Complaint reflects that the Board, not Mr. Krueger, purported to remove Paul Weiss as company counsel.[87]

Chatham also alleges that Mr. Krueger faces a substantial likelihood of liability for abstaining from the vote on the Cash Flow Proposal.[88]  As a director,[89] Mr. Krueger, like Mr. Bhow, is exculpated under Coral's Certificate of Incorporation.  Because Chatham has failed to plead that Mr. Krueger was interested in the Cash

---

[85] *Miramar Firefighters Pension Fund v. AboveNet, Inc.*, 2013 WL 4033905, at *3 (Del. Ch. July 31, 2013) ("Without more, allegations that the [] Directors acquiesced in [a Board member]'s plan are insufficient to raise a reasonable inference that they were beholden to, or controlled by, [that Board member].").

[86] SAC ¶ 62.

[87] *Id.* at Ex. 2.  I note Chatham asserts the Company's directors did not execute the written consent in compliance with Delaware statutory law.  Regardless, the written consent contradicts the allegation that Mr. Krueger terminated Paul Weiss.

[88] *Id.* at ¶¶ 76(b)-(c).

[89] Chatham has argued that, although Mr. Krueger is exculpated for actions taken as a director, he is not exculpated for actions taken as an officer of One Call.  Tr. at 89-91; AB at 38-39.  While this may be true, Chatham has not brought any claim against Mr. Krueger in his capacity as an officer.  *See* SAC ¶ 80 ("The Director Defendants, as directors of the Company, owe the Company and its stockholders the utmost fiduciary duties of due care, good faith, loyalty, and candor.").

Flow Proposal, it must plead bad faith.[90]

As with Mr. Bhow, Chatham has failed to plead that Mr. Krueger acted in bad faith in connection with the Cash Flow Proposal. Chatham's allegation that Mr. Krueger sided with Blackstone and KKR by abstaining from the Cash Flow Proposal vote fails to rise to the level of bad faith. As already explained, "a showing of bad faith in the context of demand excusal is a high hurdle, and essentially requires the plaintiff to demonstrate intentional wrongdoing by the board."[91] Normal behavior for an individual navigating the dynamics of the board room does not come close to a pleading sufficient to meet that high standard. The Cash Flow Proposal could not pass even with Mr. Krueger's vote. Recognizing this and choosing to pick one's battles and to maintain collegiality is frankly consistent with how sophisticated and experienced directors and executives operate in the real world.[92] What it is not is a particularized showing of dependence or bad faith requiring demand excusal.

---

[90] *Zuckerberg II*, 262 A.3d at 1057; 8 Del. C. § 102(b)(7). Chatham argues that "a determination that [Mr. Krueger] is not disinterested likewise leads to the conclusion that he breached his fiduciary duty of loyalty and/or care by abstaining from the vote." AB at 47-48. As described in this decision, Chatham has failed to adequately allege that Mr. Krueger was not disinterested. Accordingly, there is no basis to find that Mr. Krueger breached his fiduciary duty of loyalty.

[91] *McElrath*, 224 A.3d at 993.

[92] During a panel discussion at Fordham University School of Law, then-Justice Jacobs remarked that independence and skepticism are essential director qualities, but "[b]y the same token, what we do not want, and what I hope that we will be avoiding, will be an adversarial system within the boardroom. . . . I don't think any board can operate successfully without collegiality, and yet that same collegiality has to be exercised by people who will be fiercely independent in their own thoughts." *"New Challenges in the Boardroom": The Seventh Annual Albert A. DeStefano Lecture on Corporate, Securities & Financial Law*, 12 FORDHAM J. CORP. & FIN. L. 779, 794-95 (2007).

Chatham also repeats the same conclusory allegations it made as to Mr. Bhow: Mr. Krueger (i) "did not properly consider the information available"; (ii) "failed to implement any measures to eliminate the Conflicted Directors' conflicts of interest"; and (iii) "neglected to consider any alternatives to the Cash Flow proposal."[93] These allegations fare no better against Mr. Krueger than they did against Mr. Bhow. Chatham's pleading falls short of the high standards required for both Rule 23.1 and bad faith.[94]

As a general matter, it is also difficult to see how Mr. Krueger could face a substantial likelihood of liability for abstaining from the vote. In general, directors are not liable for claims relating to a matter on which they have abstained.[95] Although there are cases holding that abstention will not absolve a director from liability, those cases generally arise in the context of a director participating in the structuring or negotiating of the transaction and then abstaining specifically to shield

---

[93] SAC ¶ 76(b).

[94] *See, e.g., Genworth*, 2021 WL 4452338, at *22 ("Because Plaintiffs have not pled with particularity that Defendants face a substantial likelihood of liability, demand is not excused."); *In re Crimson*, 2014 WL 5449419, at *23 ("Mere disagreement with the Board's ultimate decision . . . does not show bad faith by the Board members."); *Brookfield Asset Mgmt. Inc.*, 2022 WL 223464, at *13 ("Plaintiff's allegations simply register disagreement with the [transaction], but mere disagreement does not give rise to a substantial likelihood of liability for disloyalty or bad faith." (citing *Zuckerberg I*, 250 A.3d at 897)).

[95] *In re Tri-Star Pictures, Inc., Litig.*, 1995 WL 106520, at *3 (Del. Ch. Mar. 9, 1995) ("directors' absence from the meeting, and their abstention from voting . . . shields these defendants from liability on any claims predicated upon the board's decision to approve that transaction.").

themselves from liability.[96]  There are no such allegations against Mr. Krueger in this case.  Chatham has failed to plead that Mr. Krueger either lacked independence from Blackstone and KKR or faces a substantial likelihood of liability.

Because Chatham's demand futility allegations are insufficient as to Mr. Krueger and Mr. Bhow, Chatham has failed to plead that a majority of the Demand Board was either self-interested, lacked independence, or faced a substantial likelihood of liability for breach of fiduciary duty.  Therefore, demand is not excused as to Count I.  Neither Mr. Krueger nor Mr. Bhow face any likelihood of liability on the aiding and abetting claim, and Chatham has failed to plead that Mr. Krueger or Mr. Bhow lack independence from either Blackstone or KKR.  Therefore, demand is also not excused as to Count II.

### III.  CONCLUSION

For the foregoing reasons, the Motion is granted.  IT IS SO ORDERED.

Sincerely,

*/s/ Nathan A. Cook*

Nathan A. Cook
Vice Chancellor

---

[96] *See, e.g.*, *In re Carvana Co. S'holders Litig.*, 2022 WL 2352457, at *17 (Del. Ch. June 30, 2022) (enumerating situations where "a court may hold a director liable, even if the director abstained from the formal vote to approve the transaction").